**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SHAWN GREEN,

                      Plaintiff,

           v.                              No. 9:14-CV-1215
                                            (BKS/CFH)

D. VENETTOZZI, et al.,

                      Defendants.

_____

**APPEARANCES:**                      **OF COUNSEL:**

Shawn Green
97-A-0801
Clinton Correctional Facility
P.O. Box 2000
Dannemora, New York 12929
Plaintiff pro se

Attorney General for the                DENISE P. BUCKLEY, ESQ.
  State of New York                Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

     Plaintiff pro se Shawn Green ("plaintiff"), who was, at all relevant times, in the

custody of the New York Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants

Acting Special Housing/Inmate Disciplinary Program Director D. Venettozzi; DOCCS Chief

_____

   [1] This matter was referred to the undersigned for report and recommendation pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Medical Officer C.J. Koenigsmann;[2] Regional Health Services Administrator ("RHSA") R. Blair; RHSA R. Grinbergs; DOCCS RHSA R. McDewitt; Superintendent ("Supt.") D. Uhler; Lieutenant ("Lt.") W. Trombly; Corrections Officer ("C.O.") R. Richards, Health Services Director ("FHSD") V. Mandalaywama; physician G. Schroyer; physician's assistant ("P.A.") M. Kowalchuk; Acting Nurse Administrator M. Sturgen; radiologist technologist P. Robertson; and registered nurses C. Atkinson, J. Bergeron, G. Wilson – who, at all relevant times, were employed or had duties at Upstate Correctional Facility ("Upstate") – violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. See Dkt. No. 16 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 121. Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 127, 129. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II.A infra. Plaintiff alleges that prior to his transfer to Upstate, an endocrinologist at Wende Correctional Facility implemented a treatment plan that

---

[2] Plaintiff failed to serve defendant C.J. Koenigsmann, and the 120-day service time limit set forth in Fed. R. Civ. P. 4(m) has expired. See Dkt. No. 121-3 at 3. Defendants state that because defendant Koenigsmann was not served with the complaint, he is not represented by the Office of the Attorney General, and, therefore, his liability is not addressed in the impending motion. See id. at 3 n.1. As the statute of limitations has run, the undersigned recommends that plaintiff's claims against defendant C.J. Koenigsmann be dismissed with prejudice.

2

effectively managed plaintiff's diabetes mellitus. Am. Compl. ¶ 7. A pediatrist at Wende prescribed plaintiff arch supports and Eucerin cream to treat his heel injury, pain in his feet, and "conditions of xerosis." Id. ¶ 8. On February 25, 2014, one day after plaintiff's transfer to Upstate, P.A. Kowalchuk, "for non-medical reasons," discontinued plaintiff's treatment and "inserted her own 'uninformed/superficial treatment plan' without plaintiff's consent." Id. ¶ 9. Due to P.A. Kowalchuk's interference with plaintiff's treatment plan, plaintiff suffered a series of hyper/hypoglycemic episodes. Id. ¶ 11. On February 22, 2014, plaintiff was admitted to the Upstate infirmary due to low glucose readings. Id. ¶ 14. While hospitalized in the infirmary, plaintiff's morning hypoglycemic episodes went unaddressed by nursing staff for nearly two weeks. Id. ¶ 15. During that time period, Dr. Mandalaywama did not order diagnostic tests concerning plaintiff's "unstable" diabetes; thus, the proper treatment was not prescribed. Id. ¶ 16. Plaintiff claims that "[t]here is a custom at Upstate, where no noon medication/services are provided to facility population by [the] medical department," which was a contributing factor in his constant morning hypoglycemia and nighttime hyperglycemia. Id. ¶ 17. Between February 24, 2014 and April 28, 2014, plaintiff lost ten percent of his body weight, which "went undocument[ed], unmonitored[,] and untreated after being brought to [the] nursing personnel['s] attention." Id. ¶ 18.

On March 21, 2014, plaintiff attended a podiatry consultation with non-party Mark Lentini, which was "immediately terminated from the onset following plaintiff invoking the right to a private medical consultation and access to medical care not be [interfered] with by [C.O.] Richards[.]" Am. Compl. ¶ 19. The next day, C.O. Richards issued plaintiff a

misbehavior report for refusing a direct order (106.10) and interference with an employee (107.10). Id. ¶ 20. P. Robertson, Mr. Lentini's assigned medical assistant, falsely entered into plaintiff's medical chart that he was "non-compliant and argumentative" at the March 21, 2014 appointment, and that plaintiff was "non-compliant with callout." Id. ¶ 22. Because of this false notation in his chart, plaintiff was denied treatment for his foot pain. Id. On March 24, 2014, FHSD Mandalaywama discontinued plaintiff's xerosis treatment. Id. ¶ 23. Soon after, nurse Atkinson refused to "objectively assess and treat" plaintiff's xerosis condition complaints. Id.

On April 1, 2014, Lt. Trombly commenced a disciplinary hearing regarding C.O. Richards misbehavior report. Am. Compl. ¶ 24. Plaintiff requested the consultation report that contained "Dr. Lentini['s] reference" from his appointment in order to "exonerate him of both charges," but Lt. Trombly denied his request without explanation and "under the pretense [that] Lentini's testimony [would] be 'redundant.'" Id. ¶¶ 24, 25. Instead, Lt. Trombly relied on the testimony of plaintiff, C.O. Richards, and P. Robertson. Id. ¶ 26. Lt. Trombly found plaintiff guilty of refusing a direct order, and sentenced him to three months in the special housing unit ("SHU")[3] and three months recommended loss of good time credits. Id. On May 22, 2014, Director Venettozzi "affirmed plaintiff's administrative appeal raising obvious aforesaid constitutional violations." Id. ¶ 27.

---

[3] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

In April 2014, despite a physical therapy renewal evaluation, which noted that plaintiff continued to experience pain, and that his strength and range of motion still lacked, P.A. Kowalchuk refused to submit plaintiff's physical therapy renewal request. Id. ¶¶ 12, 13. P.A. Kowalchuk also did not allow plaintiff to have a daily p.m. snack to cure his bedtime hypoglycemia episodes. Id. ¶ 12. At an unspecified time, the medical staff approved plaintiff's physical therapy renewal request, and he attended an additional six weeks of therapy, with two visits per week. Id. ¶ 30. Dr. Schroyer was assigned to provide plaintiff with routine medical care during his confinement at Upstate, and provided him with "largely ineffective treatment . . . for diabetes." Id. ¶ 31. Nurses Atkinson, Bergeron, and Wilson had a "systematic method of circumventing nurse hypoglycemia protocol aided by [Dr.] Schroyer and performed sick call procedures in a cursory manner, that resulted with the denial and interference in [p]laintiff's medical care and treatment[.]" Id. ¶ 33.

On April 27, 2014, Nurse Bergeron interfered with plaintiff's "prescribed therap[eu]tic meal" by posting a "food restriction sign" on his cell door, which resulted in staff members depriving him of "fast acting carbohydrates for AM hypoglycemia," and frequently refused to provide him with his morning insulin, "unless [p]laintiff recite[d] din [numbers] posted on [his] cell door to her beforehand, that was an approximate cause of his PM hyperglycemia immediately thereafter." Am. Compl. ¶ 33. On September 3, 2014, non-party nurse B. Brue prepared a doctor referral for plaintiff's diabetes and the alleged ineffective treatment he had received. Id. ¶ 34. Plaintiff drafted numerous letters to Dr. Koenigsmann and RHSA Grinbergs, and filed approximately seventeen grievances concerning the inadequate medical care he received, which resulted in "progressive degenerative and advance

5

development long-term health complications." Id. ¶ 35. RHSAs Grinbergs, Blair, and McDevitt failed to address plaintiff's inadequate medical care after such lack of care was brought to their attention. Id. ¶ 36. Nurse Sturgen, in her role as Acting Nurse Administrator, deprived plaintiff of adequate medical services by preparing "subjective/subversive investigation reports" for plaintiff's grievances. Id. ¶ 39.

## B. Defendants' Recitation of the Facts

In support of this motion, defendant filed a Statement of Material Facts.[4]

### 1. Plaintiff's Medical Treatment at Upstate

Plaintiff was confined at Upstate from February 24, 2014 through January 5, 2015. Dkt. No. 121-2 ¶¶ 1, 2. Prior to his transfer to Upstate, plaintiff was diagnosed with

---

[4] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

uncontrolled diabetes mellitus.  Id. ¶ 4.  On January 8, 2014, over a month before this transfer to Upstate, plaintiff received treatment for his diabetes mellitus, and it was noted that a follow-up would be scheduled in three months.  Id. ¶ 5.

Plaintiff refused to comply with the medical treatment offered to him, and has a documented history of refusing to comply with treatment that pre-dates and post-dates his confinement at Upstate.  Dkt. No. 121-2 ¶¶ 6-7.  For example, on October 6, 2014, the day plaintiff filed his complaint, plaintiff refused medical personnel's attempts to gain consent for a Controlled B diet with an evening snack – that plaintiff had requested – as well as the urine test ordered by his primary care provider.  Id. ¶ 8.  A Controlled B diet is a special diet to assist in the treatment of diabetes.  Id. ¶ 9.  At the time of his October 6, 2014 refusal of the Controlled B diet and the urine test, plaintiff did not report any medical issues or needs to the nursing personnel.  Id. ¶ 10.  Plaintiff refused a medical examination and/or treatment eight additional times from September 1, 2014 to October 6, 2014.  Id. ¶ 11. Plaintiff routinely refused his glucose gel to treat his low blood sugars during the relevant period.

Throughout his confinement, plaintiff refused multiple attempts by medical personnel to treat him for symptoms associated with his diabetes mellitus, including refusals for glucose gel, insulin (lantus), a controlled B diet, medications, endocrinology consultation, medical trips, vital sign monitoring, etc.  Dkt. No. 121-2 ¶ 13.  The refusal forms demonstrate that plaintiff was advised of the risks and/or benefits of the medication or treatment offered, including possibility of increased blood sugar, coma, permanent organ damage, worsening of condition, stroke, or death.  Id. ¶ 14.  The refusal forms also show

7

that plaintiff sometimes refused sick call entirely, or refused to state his DIN number.[5]  Id. ¶ 15.  On multiple occasions, plaintiff verbalized his understanding of the risks associated with refusing medication and/or treatment.  Id. ¶ 16.  Plaintiff also verbalized his understanding of the need to request emergency sick call if he became symptomatic for hypoglycemia.  Id. ¶ 17.  Plaintiff refused further assessment and treatment options although he was symptomatic for hypoglycemia.  Id. ¶ 18.  Plaintiff routinely refused to take medications, including metformin, on numerous occasions, and medical personnel repeatedly noted plaintiff's symptoms of hypoglycemia and that he repeatedly refused treatment.  Id. ¶ 20.

On or about September 25, 2014, plaintiff attended a medical appointment, and personnel noted in his ambulatory health record ("AHR"): "Refused glucose gel . . . Pt not compliant . . . Pt not receptive to agree to eat all meals."  Dkt. No. 121-2 ¶ 21 (internal quotation marks and citation omitted).   Medical personnel scheduled plaintiff for occupational therapy and consultations with various doctors for complaints including, but not limited to: pain in his hand and/or finger, uncontrolled diabetes mellitus, xerosis, heel pain, and dispensed arches.  Id. ¶ 23.  Medical personnel noted that plaintiff was non-compliant at a recommended appointment with podiatry on March 21, 2014 to address uncontrolled diabetes mellitus, xerosis, heel pain and dispensed arches.  Id. ¶ 24.  Plaintiff also refused to attend a scheduled endocrinology appointment on May 14, 2014 for this uncontrolled diabetes mellitus.  Id.

---

[5] Inmates are required to state their Department Identification Number ("DIN" or DIN Number") before receiving medications to ensure that the correct medications are administered.  Dkt. No. 121-2 ¶¶ 23-24.

Non-party nurse Kelly Rabideau made the March 21, 2014 entry in plaintiff's health chart indicating that he was non-compliant and argumentative at the podiatry clinic, and, therefore, that his behavior constituted a refusal; the entry was based on Nurse Rabideau's observations. Dkt. No. 121-2 ¶ 25. Plaintiff was scheduled to receive occupational therapy on a routine basis for his left 5th finger injury. Id. ¶ 26. Plaintiff's health was continuously monitored during his confinement at Upstate, and staff made numerous attempts to treat plaintiff pursuant to his treatment plan. Id. ¶ 27.

### a. Dr. Schroyer

Dr. Schroyer treated with plaintiff and/or reviewed the notations of other medical personnel pertaining to plaintiff on several occasions. Dkt. No. 121-2 ¶ 31. On February 27, 2014, Dr. Schroyer referred plaintiff for a transfer to the infirmary to monitor his diabetes mellitus symptoms due to his blood sugar level. Id. ¶ 32. On March 13, 2014, Dr. Schroyer reviewed an AHR entry indicating that plaintiff had requested an ophthalmology consult. Id. ¶ 33. Dr. Schroyer submitted the request for a new ophthalmology consult. Id. The March 13, 2014 AHR entry that Dr. Schroyer reviewed stated that plaintiff was a "brittle IDDM on Lantus and Metformin." Id. ¶ 34. The term "brittle IDDM" is commonly used by medical professionals to describe a "sub-type of type-1 diabetes (diabetes mellitus) that is particularly difficult to control." Id. ¶ 35. People who have "brittle diabetes" undergo "frequent, extreme swings in blood glucose levels, causing hyperglycemia or hypoglycemia." Id. ¶ 36.

Dr. Schroyer next interacted with plaintiff on March 17, 2014. Dkt. No. 121-2 ¶ 37.

9

Pursuant to the AHR entry, plaintiff was hypoglycemic earlier in the day, with a fasting blood sugar of 49. Id. ¶¶ 38, 39. Plaintiff's fasting blood sugar should have been approximately 120. Id. ¶ 40. At the time, plaintiff was not taking his nighttime regular insulin, resulting in a low blood sugar level. Id. ¶¶ 41, 42. Dr. Schroyer determined that the best way to raise plaintiff's blood sugar level would to stop prescribing him regular insulin and adjust his prescription for Lantus insulin. Id. ¶ 42. Dr. Schroyer believed that Lantus insulin could be beneficial because it needed to only be taken once a day and lasted for twenty-four hours. Id. ¶ 43. The next day, on March 18, plaintiff admitted to engaging in heavy exercise after this blood sugar was found to be 47. Id. ¶ 47. Heavy exercise can adversely affect blood sugar levels in someone who suffers from diabetes. Id. ¶ 48. Medical personnel counseled plaintiff regarding the difficulty in regulating his blood sugar, the necessity of taking his insulin dose, and that he should exercise in moderation as opposed to engaging in heavy exercise. Id. ¶ 49. The AHR entry on March 18 indicates that plaintiff was "somewhat argumentative." Id. ¶ 50.

On March 19, 2014, plaintiff refused to take his medication and claimed that "he knows more than medical people do." Dkt. No. 121-2 ¶ 51 (internal quotation marks and citation omitted). The AHR entry for this date also indicates that plaintiff was aware of the risks of not receiving the proper treatment for his diabetes. Id. ¶ 52. The March 21, 2014 AHR entry indicates that plaintiff was non-compliant and argumentative, and that this behavior constituted a refusal to attend the podiatry clinic. Id. ¶ 53. Because diabetes can impact circulation, which can, in turn, impact foot health, inmates with diabetes are often referred for podiatry consults. Id. ¶ 54. Plaintiff's non-compliance with the podiatry clinic,

in addition to his repeated refusals to make the prescribed medication, made his diabetes difficult to treat.  Id. ¶ 55.

On March 24, 2014, Dr. Schroyer noted in plaintiff's AHR that plaintiff's fasting blood sugar level was 243, which was higher than normal, but significantly lower than it had been the previous day, wherein it ranged from 339 to 532.  Dkt. No. 121-2 ¶ 44.  Although a blood sugar level of 243 is not ideal, it is not life-threatening.  Id. ¶ 45.  Previous entries in plaintiff's AHR indicated that he had been repeatedly non-compliant with his prescribed medication, and was engaging in activity likely to have an adverse impact on his blood sugar levels.  Id. ¶ 46.  Dr. Schroyer elected not to change plaintiff's prescription for Lantus because plaintiff's blood sugar level had already begun to drop, and he felt like Lantus was the most suitable prescription to regain control of plaintiff's blood sugar.  Id. ¶¶ 56, 57.

On April 10, 2014, medical personnel informed Dr. Schroyer that plaintiff had been in the infirmary for unstable diabetes.  Dkt. No. 121-2 ¶ 58.  Following plaintiff's discharge, Dr. Schroyer ordered standard blood tests to monitor plaintiff's condition.  Id. ¶ 59.  On April 24, 2014, Dr. Schoryer noted that plaintiff had refused to take Metformin despite being advised of the risks and benefits.  Id. ¶ 60.  Dr. Schoryer discontinued plaintiff's prescription for Metformin and noted that plaintiff would continue to be monitored at call out.  Id.  Although plaintiff complained of malnourishment, the AHR indicates that he appeared to be "very muscular with a well built physique and no signs of malnourishment." Id. ¶ 62.

On May 1, 2014, Dr. Schroyer reviewed plaintiff's blood sugar results and noted that plaintiff had been referred for an endocrinology consult.  Dkt. No. 121-2 ¶ 70.  He also

urged plaintiff to comply with the prescribed treatment. Id. The next day, plaintiff was non-compliant with his treatment plan, and refused morning blood work (a "finger stick") and regular insulin. Id. ¶ 71. On May 17, 2014, plaintiff had unstable blood sugar, inconsistently allowed finger sticks and insulin medication ("coverage"), and refused to cooperate with any treatment offered. Id. ¶ 72. The next day, plaintiff underwent a comprehensive nursing and physician evaluation, and it was noted that plaintiff had unstable blood sugars, was non-compliant with the evaluation and treatment offered, refused podiatry and endocrinology consults, refused various medications, and refused blood pressure monitoring and antihypertensive medications. Id. ¶ 73. Plaintiff's AHR noted that he was told of the risk of medical complications due to his non-compliance. Id. That same day, Dr. Schroyer examined plaintiff's feet for any sign of complications associated with his diabetes, and determined that plaintiff's feet were normal. Id. ¶ 74. Plaintiff's heart rate and neurological exam results were also normal. Id. ¶¶ 75, 76. Dr. Schroyer provided plaintiff with a treatment plan, which included a prescription medicine for blood pressure, and an addition of four units of regular insulin each morning and evening in addition to what the medication he had been already prescribed. Id. ¶ 77.

On May 19, 2014, Dr. Schroyer recommended that plaintiff continue with the "same sliding scale insulin medication" and Lantus medication as previously prescribed. Dkt. No. 121-2 ¶ 78. The "sliding scale" refers to a method for administering insulin based on the patient's blood sugar level just before a meal. Id. ¶ 79. On May 31, 2014, Dr. Schroyer reviewed plaintiff's medical chart because plaintiff's fasting blood sugar was low. Id. ¶ 80. Dr. Schroyer offered plaintiff medication to raise his blood sugar level, but plaintiff was non-

compliant, and refused a blood sugar test after breakfast. Id. On June 14, 2014, plaintiff's blood sugar was 64 in the morning, which was too low, and 317 in the evening, which was too high. Id. ¶ 81. Plaintiff refused treatment with glucose gel and verbalized an understanding of the risks and benefits. Id. ¶ 82.

On June 23, 2014, plaintiff indicated that he wanted to begin a Ramadan diet, and wanted his insulin to be adjusted when Ramadan started on June 28. Dkt. No. 121-2 ¶ 83. A Ramadan diet is not recommended for diabetics. Id. ¶ 84. Although medical personnel do not have the authority to refuse a Ramadan diet to an inmate, they may recommend that the inmate adhere to a diabetic diet for better control of his diabetes. Id. ¶ 85. Plaintiff was advised that the Ramadan diet could adversely affect his health due to his unstable blood sugars, but he declined this advice. Id. ¶¶ 86, 87. On June 25, 2014, Upstate medical staff adjusted plaintiff's medication while he was on the Ramadan diet in an effort to keep his blood sugar level within a safe range by holding the sliding scale and regular insulin, administering Lantus, and "performing a blood sugar [test] at night time." Id. ¶ 88. On July 3, 2014, Upstate medical staff returned plaintiff to the sliding scale regular insulin in the morning and evening. Id. ¶ 89. On July 14, 2014, Dr. Schroyer attempted to "refine plaintiff's insulin coverage [by] prescribing an increase in his regular insulin if it register[ed] high." Id. ¶ 90.

On August 4, 2014, plaintiff refused a diabetic diet. Dkt. No. 121-2 ¶ 91. That same day, Dr. Schroyer referred plaintiff for a podiatry consult to address an in-grown toenail. Id. ¶ 91. He also gave plaintiff Eucerin cream for his feet. Id. ¶ 91. On August 30, 2014, plaintiff again had low blood sugar, but refused treatment. Id. ¶ 95. On September 8,

2014, Dr. Schroyer recommended that plaintiff's regular insulin coverage be continued and that he be given a regular finger stick test.  Id. ¶ 96.

On October 6, 2014, plaintiff complained of indigestion.  Dkt. No. 121-2 ¶ 97.  Dr. Schroyer tested plaintiff for indigestion, and arranged to draw hemoglobin H1C.  Id. Plaintiff refused an endocrinology consult that had previously been ordered.  Id.  On November 3, 2014, Dr. Schroyer noted that plaintiff's feet were a little dry, but he refused a podiatry consult, as well as a diabetic diet.  Id. ¶ 98.  Dr. Schroyer adjusted plaintiff's insulin order and gave plaintiff Eucerin cream.  Id.  On December 22, 2014, Dr. Schroyer checked plaintiff's blood pressure, weight, and other vital signs; plaintiff's blood sugar was low, but plaintiff refused his diabetic diet.  Id. ¶ 99.  Dr. Schroyer suggested that plaintiff take Glucerna to bring his blood sugar up to a "better level."  Id.

### b. Dr. Mandalaywala[6]

In his role as FHSD, Dr. Mandalaywala oversees the entire health services for inmates at Upstate. Dkt. No. 121-2 ¶ 105.  Dr. Mandalaywala also reviews grievances from inmates concerning complaints about their medical care at Upstate.  Id. ¶ 107.  Dr. Mandalaywala saw and/or reviewed the notations of other medical personnel pertaining to plaintiff on February 27, 2014; March 11, 2014; April 12, 2014; April 13, 2014; June 12, 2014; July 4, 2014; July 8, 2014; July 9, 2014; July 23, 2014; July 24, 2014; and December 9, 2014.  Id. ¶ 108.  On February 27, 2014, Dr. Mandalaywala approved a referral for plaintiff to attend an endocrinology consultation to address plaintiff's uncontrolled diabetes

---

[6] Dr. Mandalaywala is commonly referred to by staff as "Dr. Kumar."  Dkt. No. 121-2 ¶ 109.

mellitus.  Id. ¶ 110.  Dr. Mandalaywala also approved a referral for plaintiff to undergo a podiatry consultation to address issues arising from his uncontrolled diabetes, xerosis, and heel pain.  Id.  Dr. Mandalaywala approved transferring plaintiff to the infirmary to monitor his diabetes symptoms.  Id.  Plaintiff refused both the podiatric treatment and the endocrinology consultation.  Id. ¶¶ 111, 112.

On March 11, 2014, Dr. Mandalaywala examined plaintiff and noted that his blood sugar levels needed to be checked "with coverage" three times a day.  Dkt. No. 121-2 ¶ 117.  Dr. Mandalaywala prescribed plaintiff "Lantus insulin 16 units, sliding scale, Metformin (500 mg by mouth), Enalopril (2.5 by mouth once a day), and Zantac (by mouth every night at bed time)."  Id.  Dr. Mandalaywala also referred plaintiff for an ophthalmology consultation.  Id.  On April 12, 2014, Dr. Mandalaywala adjusted plaintiff's prescription for Lantus insulin to regulate his blood sugar level.  Id. ¶ 130.  The next day, Dr. Mandalaywala again adjusted plaintiff's Lantus insulin because he had been "asymptomatic" for two nights in a row.  Id. ¶ 131.  On June 12, 2014, plaintiff refused his morning finger stick and refused to come to his cell door.  Id. ¶ 132.  Dr. Mandalaywala noted in plaintiff's AHR that he continued to be at risk for complications due to his non-compliance.  Id.  On July 24, 2014, Dr. Mandalaywala noted a treatment plan for plaintiff's insulin dosage to begin on July 28, 2014, describing the insulin types, dosages, times and additional coverage if needed.  Id. ¶ 138.

On December 9, 2014, Dr. Mandalaywala reviewed a note from Nurse Atkinson concerning plaintiff's request for State-issued boots.  Dkt. No. 121-2 ¶ 139.  There is no indication in plaintiff's medical records that Dr. Mandalaywala discontinued plaintiff's

xerosis treatment.  Id. ¶ 143.

### c. P.A. Kowalchuk

P.A. Kowalchuk saw and/or reviewed plaintiff's medical issues on February 25, 2014; February 27, 2014; March 12, 2014; March 19, 2014; April 14, 2014; April 16, 2014; April 18, 2014; April 21, 2014; April 25, 2014; May 9, 2014; May 22, 2014; May 27, 2014; May 28, 2014; May 30, 2014; June 13, 2014; June 27, 2014; July 2, 2014; August 12, 2014; September 19, 2014; and December 17, 2014.  Dkt. No. 121-2 ¶ 152.  P.A. Kowalchuk evaluated plaintiff on February 25, 2014, and adjusted his medications in an effort to control plaintiff's irregular blood sugar readings.  Id. ¶ 158.  To the extent that P.A. Kowalchuk discontinued plaintiff's regular insulin coverage, except for the sliding scale, she increased plaintiff's Lantus insulin from twenty-four units to twenty-six units in the morning. Id.  P.A. Kowalchuk decided to alter plaintiff's insulin coverage due to his fluctuating blood sugars, and gave direction as to how much insulin to administer if plaintiff's blood sugar reached a particular level.  Id. ¶¶ 159, 162.  P.A. Kowalchuk did not provide Eucerin for plaintiff's feet because she did not feel it was medically necessary; however, she noted that plaintiff should be evaluated by his treating physician at his next call out to determine whether any change in his condition would warrant Eucerin cream.  Id. ¶ 163.  At the February 25, 2014 appointment, P.A. Kowalchuk referred plaintiff for podiatry and endocrinology consultations, ordered a series of tests used in the treatment of diabetes, and refilled plaintiff's prescriptions for Enalapril and Zantac.  Id. ¶¶ 165-67.

On February 27, 2014, after plaintiff complained that he did not receive his diabetic

diet with an evening snack, P.A. Kowalchuk recommended that plaintiff be provided with the requisite diet. Dkt. No. 121-2 ¶¶ 169-70. The nurse on duty notified the mess hall and security staff that plaintiff's diabetic meal would start with the supper meal and include an evening snack. Id. ¶ 171. Plaintiff verbalized his understanding that he needed to notify the nursing and security staff should he not receive the proper meal in the future. Id. ¶ 172. Under proper medical protocol, plaintiff could not be provided an evening snack if he was not on the Controlled B diet and taking insulin; thus, during periods of non-compliance, plaintiff could not be provided an evening snack. Id. ¶¶ 174-76. At the February 27, 2014 visit, P.A. Kowalchuk assessed plaintiff and noted no other signs or symptoms of hypoglycemia other than low blood sugar. Id. ¶ 177. P.A. Kowalchuk administered Lantus insulin as prescribed, and provided plaintiff with a tube of glucose gel to use if needed, and then returned to the corrections officer bringing him lunch. Id. ¶¶ 178, 180. Plaintiff returned the glucose gel unused. Id. ¶ 181.

On April 14, 2014, P.A. Kowalchuk noted that plaintiff had underwent twelve physical therapy sessions for his hand, and felt that it was appropriate to discontinue these visits because plaintiff could perform the exercises in his cell. Dkt. No. 121-2 ¶ 185. Instead, P.A. Kowalchuk prescribed plaintiff warm packs to apply to his hands. Id. ¶ 186. Two days later, P.A. Kowalchuk wrote orders for plaintiff to restart Metformin at 500mg for thirty days twice a day, and to decrease Lantus insulin to ten units daily at nighttime with a finger stick. Id. ¶ 188. She also requested that the nursing staff administer his medication as plaintiff was routinely refusing medical care. Id. ¶ 189. On July 2, 2014, P.A. Kowalchuk again adjusted plaintiff's insulin as his blood sugar was too high. Dkt. No.

121-2 ¶ 191.

### d. Nurse Bergeron[7]

Plaintiff's AHR indicates that she saw plaintiff for sick call or made notations in his AHR approximately fifty-one times throughout his confinement at Upstate.  Dkt. No. 121-2 ¶ 200.  When Nurse Bergeron met plaintiff for sick call, she routinely:

> evaluated plaintiff and any health-related complaints; recorded any symptoms she observed; as necessary, provided plaintiff with non-prescription (commonly referred to as "over the counter") medications including antacids for acid reflux, anti-fungal cream for his feet, Tylenol for complaints of pain and glucose gel for low blood sugar readings; and administered medication(s) that had been prescribed for plaintiff, including insulin to regulate blood sugar levels for his diabetes mellitus.

Id. ¶ 201.  Plaintiff's AHR indicates that he frequently refused to comply with treatment and medications prescribed for him, and was occasionally confrontational.  Id. ¶ 202.  On April 16, 2014, Nurse Bergeron offered plaintiff glucose gel when his blood sugar reading was low, but he refused.  Id. ¶ 204.  Nurse Bergeron did not order plaintiff a dietary restriction on April 27, 2014, nor did she place a dietary restriction notice on plaintiff's cell.  Id. ¶ 205.  As a registered nurse, Nurse Bergeron is not authorized to order a dietary restriction of an inmate.  Id. ¶ 206.

During Ramadan, it was noted in plaintiff's AHR that his July 4, 2014 morning finger stick reading was high.  Dkt. No. 121-2 ¶ 207.  Pursuant to Dr. Mandalaywala's order,

---

[7] Defendants note that defendant Jamie Bergeron is now known as Jamie Tavernier.  Dkt. No. 121-2 at 25.

Nurse Bergeron administered ten units of regular insulin, and plaintiff's blood sugar level decreased.  Id.  On numerous occasions, plaintiff refused to state his DIN number, which constitutes a refusal of medications.  Id. ¶¶ 211, 212.  Plaintiff also often refused to see Nurse Bergeron at sick call, and, therefore, Nurse Bergeron was unable to provide him treatment.  Id. ¶¶ 215, 216.  At no point did Nurse Bergeron refuse plaintiff his morning insulin or prescribed medications.  Id. ¶¶ 225, 226.

### e. Nurse Sturgen

Nurse Sturgen assumes the role of Acting Nurse Administrator in the absence of the regular Nurse Administrator, when such coverage is needed.  Dkt. No. 121-2 ¶ 231.  Nurse Sturgen has acted in this role throughout her employment, when necessary.  Id. ¶ 232.  Nurse Sturgen saw plaintiff for sick call on two occasions.  Id. ¶ 237.  On September 26, 2014, Nurse Sturgen met with plaintiff, and noted that he had been seen by podiatry for treatment and excision of bilateral ingrown toenails.  Id. ¶ 238.  On December 11, 2014, Nurse Sturgen met with plaintiff, and noted that he had been seen by optometry and was to follow-up in one year.  Id. ¶ 239.

In her role as Acting Nurse Administrator, Nurse Sturgen is required to investigate inmates' complaints and grievances concerning allegations of nursing personnel misconduct.  Dkt. No. 121-2 ¶ 242.  On April 11, 2014, Nurse Sturgen completed an Investigative Report in conjunction with the investigation surrounding plaintiff's March 26, 2014 grievance (#53718-14).  Id. ¶ 245.  Nurse Sturgen stated:

> Grievant claims he is receiving inadequate medical care for his

19

> diabetes - claims Dr. Kumar does not know what he is doing.
> The chart was reviewed.  The grievant is receiving proper
> medical care for his diabetes.  Lantus insulin can be given
> either in the evening or in the morning.  Lantus is a 24 hour
> insulin.  Meals are covered with regular insulin according to the
> patient's blood sugar.  This is called a sliding scale.  This is the
> way Dr. Kumar has handled the grievant's diabetes which is
> the community standard of care.

Id. ¶ 246.

### f. Nurse Wilson

Nurse Wilson met with plaintiff for sick call on approximately seventeen occasions during his confinement at Upstate.  Dkt. No. 121-2 ¶ 261.  When Nurse Wilson met with plaintiff for sick call, she routinely:

> evaluated plaintiff's symptoms, recorded any symptoms she
> observed, administered medications such as insulin to regulate
> blood sugar levels for his diabetes mellitus, and, as necessary,
> she provided plaintiff with non-prescription (commonly referred
> to as "over the counter") medications including antacids for
> acid reflux and Vitamin E for dry, flaky feet when indicated.

Id. ¶ 262.  On February 25, 2014, Nurse Wilson noted that plaintiff's prescriptions had been ordered via phone call to the pharmacy for refills.  Id. ¶ 263.  She educated plaintiff regarding his blood sugar, and informed him to notify the nursing staff as needed.  Id.  On July 29, 2014, Nurse Wilson met with plaintiff, and he requested an eye exam with the optometrist and a podiatry consultation.  Id. ¶ 268.  Plaintiff had previously seen the optometrist on April 17, 2014, and was not due for another optometry appointment, as plaintiff did not state any problems with his eyes.  Id. ¶ 269.  Nurse Wilson did not note any problems with plaintiff's feet, and did not order a podiatry appointment.  Id. ¶ 270.

**g. Nurse Atkinson**

Nurse Atkinson met with plaintiff for sick call on approximately seventy-five occasions throughout his confinement at Upstate.  Dkt. No. 121-2 ¶ 85.  When Nurse Atkinson met with plaintiff, "she routinely evaluated plaintiff's symptoms, recorded any symptoms she observed, and, as necessary, she provided plaintiff with non-prescription (commonly referred to as "over the counter") medications including Medicidin-D, antacids for acid reflux, anti-fungal cream for his feet, Tylenol and Aspirin for complaints of pain." Id. ¶ 286.  Plaintiff refused to meet with Nurse Atkinson for sick call numerous times.  Id. ¶ 287.  Plaintiff repeatedly refused glucose gel to treat his blood sugar levels, as well as Metformin and insulin.  Id. ¶¶ 289, 290.

On May 18, 2014, Nurse Atkinson noted in plaintiff's AHR that a comprehensive nursing assessment had been performed and revealed that plaintiff had unstable blood sugar levels.  Dkt. No. 121-2 ¶ 292.  At the assessment, plaintiff was non-compliant, and refused to undergo an endocrinology consultation and a podiatry consultation.  Id.  He also refused to undergo "blood pressure evaluations," and declined Metformin, Zantac, Enalpril, and anti-hypertensive medications.  Id. Nurse Atkinson terminated the call out due to plaintiff's behavior, and noted that she referred plaintiff to the Office of Mental Health ("OHM") and advised him to follow up with his primary care provider.  Id. ¶¶ 292, 293.  On May 31, 2014, plaintiff refused a follow-up finger stick check, even though the morning finger stick indicated that plaintiff's blood sugar level was low.  Id. ¶ 296.

### h. Patti Robertson, Senior Radiologic Technologist

On March 21, 2014, Ms. Robertson performed an x-ray of plaintiff during a scheduled podiatry examination. Dkt. No. 121-2 ¶ 311. During the examination, Ms. Robertson observed plaintiff disobey a direct order from C.O. Richards. Id. ¶ 312. C.O. Richards instructed plaintiff to remove his right boot and sock only, as requested by the physician, but plaintiff attempted to remove the boots and socks off both of his feet. Id. ¶ 313. Ms. Robertson did not interact with plaintiff during the incident, and did not make a notation in plaintiff's chart. Id. ¶¶ 314, 315. On April 1, 2014, Ms. Robertson testified as to what she had witnessed on March 21, 2014 at plaintiff's Tier III disciplinary hearing. Id. ¶ 317.

### i. Russell Blair, RHSA

In his role as RHSA, Mr. Blair's duties included, but were not limited to:

> (1) acting as a liaison between facility executive teams and Division of Health Services Staff; (2) collaborating with facility superintendents and staff on applying health care policies and procedures and assessing their impact; (3) acting as a liaison with other DOCCS offices on administrative and operational related matters impacting Heath Services; (4) monitoring facility compliance with directives, policies and procedures regulating health care delivery; (5) participating in periodic facility-based quality management audits; (6) assisting in the development of Health Services policies and procedures; (7) investigating and responding to inmate related grievances in collaboration with Central Office Inmate Grievance Program staff; and (8) attending Central Office Review committee meetings as necessary.

Dkt. No. 121-2 ¶ 322. Mr. Blair does not personally provide medical care to inmates,

22

decide an inmate's appropriate treatment, or resolve disputes between inmates and their doctors as to the appropriate medical treatment.  Id. ¶ 323.

Mr. Blair received letters from plaintiff dated June 26, 2014; September 23, 2014; and October 1, 2014 concerning plaintiff's medical treatment.  Dkt. No. 121-2 ¶ 328.  Mr. Blair informed plaintiff that his concerns were being addressed by the Inmate Grievance Program ("IGP") at the facility where he resided, and that the Central Office, where Mr. Blair was employed, was not the proper avenue to address his grievance concerns.  Id. ¶¶ 330, 331.  Mr. Blair also advised plaintiff to utilize the sick call procedure to address his medical concerns.  Id. ¶ 332.  In his responses, Mr. Blair further advised plaintiff that the Division of Health Services had investigated his concerns, and that plaintiff should address his health concerns at an upcoming appointment with his primary care provider.  Id. ¶ 333.  Plaintiff routinely forwarded his grievances directly to the Central Office, and Mr. Blair repeatedly advised him that, pursuant to DOCCS Directive 4040, grievances were first addressed at the facility level.  Id. ¶ 340.

### j. Rita Grinbergs, RHSA

In her role as RHSA, Ms. Grinbergs' duties included those discussed supra.  See Dkt. No. 121-2 ¶¶ 322, 346.  Ms. Grinbergs received letters from plaintiff dated February 25, 2014; March 14, 2014; March 21, 2014; March 24, 2014; March 26, 2014; and March 30, 2014.  Id. ¶ 351.  In two of Ms. Grinbergs' responses, she advised plaintiff that his concerns were being addressed by the Upstate IGP.  Id. ¶ 353.  She also advised plaintiff that the Central Office was not the appropriate venue to address his grievance concerns,

and that any medical issues should be brought to the attention of the Upstate medical staff. Id. ¶¶ 354, 355.  In response to plaintiff's request to be transferred to another facility, Ms. Grinbergs informed plaintiff that the Division of Health Services had investigated his concerns and concluded that his health needs could be met at Upstate.  Id. ¶ 356.  In a third response, Ms. Grinbergs told plaintiff that the Division of Health Services had investigated his claims, and that he should address his medical concerns at his upcoming appointment with his primary care provider.  Id. ¶ 357.

### k. Richard McDevitt, RHSA[8]

In her role as RHSA, Mr. McDevitt's duties included those discussed supra.  See Dkt. No. 121-2 ¶¶ 322, 362.  Mr. McDevitt received letters from plaintiff dated April 1, 2014; April 10, 2014; May 21, 2014; and May 21, 2014.  Id. ¶ 366.  In response to plaintiff's letters, Mr. McDevitt advised plaintiff that his concerns were being addressed by the Upstate IGP.  Id. ¶ 369.  Mr. McDevitt also advised plaintiff that the Central Office was not the proper venue to address his grievance concerns, and to address his medical concerns with the Upstate medical staff.  Id. ¶¶ 370, 371.  Mr. McDevitt informed plaintiff that the Division of Health Services had investigated his claims, and after review of his medical records, concluded that plaintiff routinely refused medical appointments and medication administration.  Id. ¶ 372. Plaintiff's medical records also established that plaintiff had daily access to "comprehensive primary, secondary and emergent health care services."  Id.  As

---

[8] Mr. McDevitt currently holds the position of Assistant Director for Correctional Health Services at DOCCS' Central Office.  Dkt. No. 121-2 ¶ 360.  Plaintiff incorrectly names "R. McDewitt" in the caption.

plaintiff's allegations concerning facility security issues and nursing staff malfeasance were unfounded, Mr. McDevitt informed plaintiff that the Division of Health Services encouraged him to cooperate fully with the medical staff in the administration of his medical care plan. Id. ¶ 373.

### 2. C.O. Richards' Misbehavior Report and the Tier III Disciplinary Hearing

On March 21, 2014, C.O. Richards issued plaintiff a misbehavior report charging him with refusing a direct order (106.10) and interference with an employee or other person (107.10). Dkt. No. 121-2 ¶ 377. The misbehavior report indicated that C.O. Richards and non-party C.O. Rondo escorted plaintiff to a podiatry appointment. Id. ¶ 378. On entering the examination room, C.O. Richards inquired with the nurse and doctor as to what restraints and clothing needed to be removed. Id. ¶ 379. The doctor stated that plaintiff's right boot and sock needed to be removed. Id. C.O. Richards removed plaintiff's handcuffs, and plaintiff removed his right boot and sock. Id. ¶ 380. Plaintiff then proceeded to remove his left boot, and C.O. Richards advised him that the doctor only wanted him to remove his right boot and sock. Id. ¶¶ 381, 382. Pursuant to the misbehavior report, plaintiff became argumentative and stated, "I will due [sic] what I want and I want the doctor to look at my left foot also." Id. ¶ 383 (internal quotation marks and citation omitted). C.O. Richards gave plaintiff "several direct orders to only remove his right boot and plaintiff continued to yell and argue." Id. ¶ 384. C.O. Richards told plaintiff that if he continued to be disruptive, he would terminate the appointment. Id. ¶¶ 384, 385. Plaintiff continued to be argumentative, and stated, "I'm going to due [sic] what I want." Id.

¶ 386.  C.O. Richards terminated the appointment, and returned plaintiff to a holding pen. Id. ¶ 388.

On April 1, 2014, Lt. Trombly commenced a Tier III disciplinary hearing concerning the allegations in the March 21, 2014 misbehavior report.  Dkt. No. 121-2 ¶ 394.  Plaintiff pleaded not guilty to the refusing a direct order charge, but admitted that he did not follow C.O. Richards' instructions because he "did not understand it was wrong." Id. ¶ 395.  Non-party C.O. Loeb acted as plaintiff's employee assistant, and interviewed witnesses on plaintiff's behalf.  Id. ¶¶ 399, 400.  At the hearing, plaintiff requested as witnesses the nurse and doctor that were in the examination room, as well as two inmates.  Id. ¶ 411. Lt. Trombly called Ms. Robertson, a senior x-ray technologist to testify.[9]  Id. ¶ 412.  Ms. Robertson confirmed C.O. Richards' account of the incident, and identified the doctor as non-party Dr. Langstein.  Id. ¶¶ 413, 414.  Lt. Trombly denied plaintiff's request to call Dr. Langstein as a witness because his testimony would have been redundant to the testimony of C.O. Richards and Ms. Robertson.  Id. ¶ 419.

Lt. Trombly found plaintiff not guilty of interference with an employee (107.10) and guilty of refusing a direct order, and sentenced plaintiff to three months in SHU and recommended three months loss of good time.  Dkt. No. 121-2 ¶ 429.  Plaintiff appealed his disciplinary disposition, and Director Venettozzi upheld the determination of guilty.  Id. ¶¶ 445, 446.

---

[9] Ms. Robertson was the other person in the examination room on March 21, 2014, whom plaintiff believed was a nurse.  See Dkt. No. 121-2 ¶ 311-17.

## II. Discussion[10]

### A. Legal Standards

### 1. Summary Judgment Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party."  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material

---

[10]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

fact.  Id.  "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts.  See N.D.N.Y. L.R.  7.1(a)(3).  "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue."  Id.  The opposing party is required to file

a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis omitted).

Defendants argue that "plaintiff has provided no response to defendants' statement of material facts despite the fact that defendants specifically notified him of the consequences of failing to respond[.]" Dkt. No. 129 ("Def. Reply") at 3. Defendants acknowledge that plaintiff has provided a document entitled "Statement of Disputed Factual Issues," but note that the document only sets out twenty-five alleged issues of material fact, and is not responsive to their statements. Id. at 4. Defendants contend that even if the undersigned construed plaintiff's "Statement of Disputed Factual Issues" as responsive to their Rule 7.1(a)(3) statement, it "would amount to nothing more than conclusory denials of defendants' factual assertions," which do not constitute a sufficient response under the Local Rules. Id.

The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Prestopnik v. Whelan, 253 F. Supp 2d 369, 371 (N.D.N.Y. 2003) (concluding that the "plaintiff's suggestion that the transcript and videotape of the [incident] be reviewed to identify support for her Statement of Material Facts Not in Dispute does not cure her failure to comply with Rule 7.1(a)(3)."). Although defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert" with specific citations to the record, pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R.

7.1(a)(3); Def. Reply at 3-4; see subsection II (A) supra.  Accordingly, in deference to plaintiff's pro se status, the Court will independently review the record when evaluating defendants' Motion for Summary Judgment, and "treat plaintiff's opposition as a response to" defendants' Statement of Material Facts.  Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to Plaintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement."); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgment.").

## B. Personal Involvement

RHSAs Blair, Grinbergs, and McDevitt contend that they were not personally involved in the treatment of plaintiff's diabetes.  See Def. Mem. of Law at 11-13; Dkt. Nos. 121-12 ("Blair Decl."), 121-14 ("Grinbergs Decl."), 121-16 ("McDevitt Decl.").[11]  Supt. Uhler also argues that he was not personally involved in the underlying action.  See Def. Mem.

---

[11] Defendants' memorandum of law does not address plaintiff's supervisory claims against Mr. Blair and Mr. McDevitt, but their declarations set forth similar arguments as Ms. Grinberg's declaration. See generally Blair Decl.; Grinbergs Decl; McDevitt Decl.  As such, the undersigned will address whether Mr. Blair and Mr. McDevitt were personally involved in the alleged inadequate medical care in conjunction with the assessment of Ms. Grinbergs.

of Law at 11-13.  Although not addressed by defendants in their brief, Ms. Robertson also argues that she was not personally involved in plaintiff's medical treatment plan.  Dkt. No. 121-37 ("Robertson Decl.") ¶ 29.  To hold a defendant liable under section 1983, the plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Supervisory officials may not be held liable merely because they held a position of authority.  See Wright, 21 F.3d at 501; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, a defendant may be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).[12]  Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact.  See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).  Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation.  Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

### 1. Mr. Blair, Ms. Grinbergs, Mr. McDevitt

Plaintiff contends that Mr. Blair, Ms. Grinbergs, and Mr. McDevitt failed to "remedy unconstitutional medical practice[s] at Upstate, assigned to them for resolution, allowing the continuance of unconstitutional medical practices at Upstate, exhibiting deliberate indifference by failing to act on unconstitutional practice made aware of that was occurring at Upstate."  Dkt. No. 121-8 ("Pl. Dep.") at 127.  The record demonstrates that, throughout his confinement at Upstate, plaintiff sent fourteen letters and/or other correspondence to the Central Office concerning plaintiff's allegations of inadequate medical care; complaints regarding nurses Atkinson, Bergeron, and Wilson, as well as x-ray technician Ms. Robertson; and a request for a transfer to a different facility.  See generally Dkt. Nos. 121-

---

[12] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

13, 121-15, 121-17.   Plaintiff addressed three of the letters to DOCCS Chief Medical Officer Koenigsmann and five to Ms. Grinbergs; the six remaining letters were copies of complaints and/or grievances.  See id.  Defendants informed plaintiff that his concerns were being addressed by the Upstate IGP, and that the Central Office was not the appropriate venue to address his grievance concerns.  See Blair Decl. ¶¶ 20-21; Grinbergs Decl. ¶¶ 20-21; McDevitt Decl. ¶¶ 19-20.   Defendants advised plaintiff to address his medical concerns using the sick call procedure, that the Division of Health Services had investigated his concerns, and that plaintiff should address his health care concerns at his upcoming appointment with his primary care provider.  See Blair Decl. ¶¶ 22-23; Grinbergs Decl. ¶ 24; McDevitt Decl. ¶ 21.

In response to plaintiff's transfer request, Ms. Grinbergs informed him that the Division of Health Services had investigated his concerns, and concluded that plaintiff's health needs could be met at Upstate.  Grinbergs Decl. ¶ 23.   Mr. McDevitt also informed plaintiff that the Division of Health Services had investigated his concerns, and plaintiff's medical record demonstrated "a pattern of refusals related to medical appointments, and medication administration, it also revealed that he had an active medical care plan in place and had daily access to comprehensive primary, secondary and emergent health care services."  McDevitt Decl. ¶ 22.  Mr. Blair, Ms. Grinbergs, and Mr. McDevitt declared that plaintiff's inquiries and concerns were referred to the appropriate DOCCS staff and personnel to address his concerns.  See Blair Decl. ¶¶ 27-29; Grinbergs Decl. ¶¶ 26-28; McDevitt Decl. ¶¶ 24-25.

To the extent that plaintiff seeks to establish Mr. Blair, Ms. Grinbergs, and Mr.

McDevitt's personal involvement through sending letters, this argument must fail.  It is well-settled that merely writing letters and grievances to a defendant is insufficient to establish personal involvement.  See Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold the official liable for the alleged violation.") (quotations omitted).  Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (citing cases).  There is no indication in the record that Mr. Blair, Ms. Grinsberg, or Mr. McDevitt personally investigated plaintiff's claims; in fact, defendants declared that they advised plaintiff that the Division of Health Services had investigated his concerns.  See Blair Decl. ¶¶ 22-23; Grinbergs Decl. ¶ 24; McDevitt Decl. ¶ 21.  Thus, plaintiff has failed to establish that Mr. Blair, Ms. Grinbergs, or Mr. McDevitt were personally involved in any alleged Eighth Amendment violation.

Even if a reasonable factfinder could determine that, based on plaintiff's continuous complaints, Mr. Blair, Ms. Grinbergs, and Mr. McDevitt had some "reason to suspect that the facility medical staff was not treating plaintiff appropriately," Hardy v. Diaz, No. 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at *8 (N.D.N.Y. Mar. 30, 2010) report-

recommendation and order adopted, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010). (concluding that the defendant Regional Health Services Administrator's limited involvement was insufficient to establish liability under section 1983), as discussed infra, there is no evidence in the record that defendants were deliberately indifferent to plaintiff's medical needs. See subsection II.C. infra, at 39-54; Gathers v. Tan, No. 10-CV-0475S(Sr), 2014 WL 12648666, at *11 (W.D.N.Y. Aug. 21, 2014) ("While RHSA Blaise's investigation of plaintiff's complaint of inadequate medical care is sufficient to establish personal involvement of a supervisory official, there is no question but that at the time of her investigation, there was no evidence of deliberate indifference to plaintiff's medical needs for RHSA Blaise to remedy because plaintiff was scheduled for the MRI he was requesting."), affirmed 619 F. App'x 19 (2d Cir. 2015) (summary order).  Thus, because there is no underlying deliberate indifference claim that  Mr. Blair, Ms. Grinbergs, and Mr. McDevitt failed to remedy, it is recommended that defendants' motion on this ground be granted.

### 2. Supt. Uhler

Plaintiff contends that Supt. Uhler was aware of his complaints and grievances concerning defendants' alleged inadequate medical care, and failed, in his supervisory capacity, to "ensure that subordinates directed to address them[,] enforce the applicable laws."  Am Compl. ¶ 36, at 12.  Defendants argue that Supt. Uhler's involvement in plaintiff's claims "was limited to rendering dispositions at the conclusion of the investigations of a number of grievances plaintiff brought."  Def. Mem. of Law at 12.  "[I]t

is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ).  "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74-75 (2d. Cir. 1996)).

Defendants proffer copies of the relevant grievances wherein plaintiff contends that he received inadequate medical care.  See generally Dkt. No. 121-19.  The record indicates that a majority of plaintiff's grievances were assigned to Acting Nurse Administrator Sturgen, Nurse Administrator Smith, or a member of the security staff for investigation, who, therein, concluded that plaintiff's allegations lacked merit.  See id. at 199-217.  Further, Supt. Uhler declared that he "routinely render[s] dispositions at the conclusion of grievance investigations and base[s] his dispositions solely on the investigations completed and the information provided from other DOCCS personnel and their respective findings after such investigations."  Dkt. No. 121-18 ("Uhler Decl.") ¶ 25. Although Supt. Uhler's dispositions often provided a recitation of the respective personnel's conclusions, there is no indication that he denied plaintiff's grievances based on his own investigation of plaintiff's complaints.  See Dkt. No. 121-19 at 199-217.  Moreover, "'[t]here is nothing whatsoever in the record to indicate that [the] investigation[s] w[ere] flawed or

biased and even if they were, there is nothing to suggest that [Uhler] knew or should have know that fact.'" Brooks v. Chappius, 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) (quoting Sprau v. Coughlin, 997 F. Supp. 390, 394 (W.D.N.Y.1998)).

Even assuming that Supt. Uhler's level of participation was sufficient to render him personally involved, plaintiff's supervisory claims still must fail.  Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability.  See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").  As discussed infra, plaintiff has failed to raise an issue of material fact with respect to his Eighth Amendment deliberate indifference claim or his Fourteenth Amendment due process claim.  See subsection II.C., II.E infra, at 39-54, 59-69.

Finally, to the extent that plaintiff contends that Supt. Uhler should be held liable for his failure to supervise his subordinates, it has been held that a "Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so."  Hardy, 2010 WL 1633379, at *7,  As Supt. Uhler lacks the requisite medical training, he cannot be held liable under section 1983.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### 3. Ms. Robertson

Plaintiff contends that Ms. Robertson refused him regular treatment and therapy for his diabetes by making false entries into his medical chart during a podiatry consultation on March 21, 2014.  See Am. Compl. ¶¶ 22, 26.  Defendants do not address plaintiff's claims against Ms. Robertson.  Ms. Robertson declared that, in her role as a radiologic technologist, she does not have the authority to

> (1) prescribe or discontinue an inmate's medication (including insulin), dietary plans or special diabetic diets; (2) refer an inmate for physician approved testing procedures such as a colonoscopy, endoscopy, CT scan, MRI, EEG, EKG or a consultation with a specialist such as a podiatrist, opthamologist or endocrinologist; or (3) request special issue medical boots or shoes, including insoles.

Dkt. No. 121-37 ("Robertson Decl.") ¶ 13.  Instead, she may only provide an inmate with the x-ray testing procedures prescribed by the inmate's health care provider.  Id. ¶ 14.

The undersigned concludes that there is no indication in the record that Ms. Robertson was personally involved in plaintiff's alleged inadequate medical care.  Ms. Robertson declared that she did not make an entry in plaintiff's medical records on March 21, 2014, nor did she have the authority to make an entry.  Id. ¶¶ 17-18; see Dkt. No. 121-38 at 2 (depicting the March 21, 2014 AHR entry, which states, "non-compliant and argumentative at podiatry clinic[.] not seen constitutes a refusal").  Moreover, non-party nurse Kelly Rabideau declared that she made the March 21, 2014 entry in plaintiff's medical records based on her observations of plaintiff while in the podiatry clinic.  Dkt. No. 121-46 ("Rabideau Decl.") ¶¶ 14-16.  As defendants have presented facts establishing that Ms. Robertson did not make the entry in plaintiff's medical records, plaintiff's Eighth

Amendment claim against her must fail.  As such, it is recommended that plaintiff's Eighth Amendment claim against Ms. Robertson be dismissed.

## C. Eighth Amendment

Plaintiff contends that Dr. Mandalaywama; Dr. Schroyer; P.A. Kowalchuk; and nurses Atkinson, Bergeron, Wilson, and Sturgen were deliberately indifferent to his serious medical needs by failing to properly treat his diabetes mellitus and other medical issues. See generally Am. Compl.  Defendants argue that insufficient evidence exists in the record to support plaintiff's medical indifference claim.  See Dkt. No. 121-3 ("Def. Mem. of Law") at 5-11.

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The deliberate indifference standard consists of both an objective and subjective component. Hathaway, 37 F.3d at 66.  The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious."  Id.  The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

For an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury.  See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted).  "Determining whether a deprivation is an objectively serious deprivation entails two inquiries."  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006)).  First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).  "Prison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." Jones v. Westchester Cnty. Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).  However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994).  Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at 280

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition

> significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

Id. (internal citation and quotation marks omitted).

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280 (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" Wright v. Genovese, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing Farmer, 511 U.S. at 844)). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 154-155 (quoting Salahuddin, 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

The crux of plaintiff's medical indifference claim centers on defendants' alleged deficiency in managing his diabetes mellitus. See generally Am. Compl. However, the undersigned finds that plaintiff has failed to provide evidence from which a fact-finder could reasonably conclude that defendants' alleged failures constitute deliberate indifference to plaintiff's sufficiently serious medical condition. See Salahuddin, 467 F.3d at 279. There is no indication in the record that defendants provided plaintiff with inadequate treatment; in fact, the record establishes the opposite.

### 1. Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk

### a. Objective Component

Dr. Mandalaywala declared that he met with plaintiff and/or reviewed plaintiff's medical chart on eleven occasions during his confinement at Upstate. Dkt. No. 121-24 ("Mandalaywala Decl.") ¶ 18. During that time frame, Dr. Mandalaywala approved referrals for plaintiff's endocrinology, podiatry, and ophthalmology consultations to address his

42

diabetes, xerosis, and heel pain; transferred plaintiff to the infirmary to monitor his diabetes symptoms; and adjusted plaintiff's prescriptions for Lantus insulin, Metformin, Enapril, and Zantac to treat his fluctuating blood sugar levels on at least six occasions.  Id. ¶¶ 23, 30, 46, 47, 55, 57, 59.

Dr. Schroyer declared that he treated plaintiff and/or reviewed his medical chart on "several occasions.  Dkt. No. 121-29 ("Schroyer Decl.") ¶ 16.  On March 17, 2014, Dr. Schroyer adjusted plaintiff's Lantus prescription as he felt that "the best way to try and get [plaintiff's] blood sugar up to a normal level would be to stop prescribing him regular insulin and adjust his prescription for Lantus insulin."  Id. ¶¶ 25, 30. On March 24, 2014, Dr. Schroyer elected not to adjust plaintiff's Lantus prescription because he felt that "a long lasting medication such as Lantus was the most suitable way to try and regain control over plaintiff's blood sugar."  Id. ¶¶ 44, 45.  On April 24, 2014, Dr. Schroyer discontinued plaintiff's Metformin prescription as plaintiff refused the medication.  Id. ¶ 48.  On May 18, 2014, Dr. Schroyer examined plaintiff's feet for complications associated with his diabetes, and found that plaintiff's feet were normal.  Id. ¶ 62.  Plaintiff's heart rate and neurological examination results were also normal.  Id. ¶¶ 63, 64.  Dr. Schroyer reviewed plaintiff's blood sugar results with him, and provided a treatment plan that included a prescription medicine for blood pressure, and an additional four units of regular insulin each morning and evening in addition to what he had already been prescribed.  Id. ¶ 65.  Dr. Schroyer met with plaintiff the next day and recommended he continued with the same sliding scale medication and Lantus medication as prescribed.  Id. ¶ 66.

On July 14, 2014, Dr. Schroyer attempted to refine plaintiff's insulin coverage by

prescribing an increase in his regular insulin if his blood sugar measured high.  Schroyer Decl. ¶ 78.  On August 4, 2014, Dr. Schroyer referred plaintiff for a podiatry consultation to address an in-grown toe nail, and provided him Eucerin cream for his feet.  Id. ¶ 79.  On August 10, 2014, Dr. Schroyer offered to admit plaintiff to the infirmary to help better control his blood sugar level but he refused.  Id. ¶ 80.  Dr. Schroyer offered plaintiff treatment on at least five other occasions, and he refused.  Id. ¶¶ 82, 83, 85, 86, 87.

P.A. Kowalchuk declared that she met with plaintiff and/or reviewed his chart on at least twenty occasions during his confinement at Upstate.  Dkt. No. 121-33 ¶ 16.  P.A. Kowalchuk first met with plaintiff the day after his transfer to Upstate.  Id. ¶ 17.  As was the customary practice, she reviewed plaintiff's prior medical care plan; in an effort to control his irregular blood sugar readings, P.A. Kowalchuk discontinued plaintiff's regular insulin coverage, except for the sliding scale, and increased his Lantus insulin from twenty-four units to twenty-six units in the morning.  Id. ¶¶ 24, 25.  She referred plaintiff to endocrinology for further evaluation to determine what the appropriate treatment recommendations would be to better control his blood sugars.  Id. ¶ 25.  P.A. Kowalchuk chose not to provide plaintiff with Eucerin cream for his feet because she did not believe it was medically necessary at that time.  Id. ¶ 29.  At the February 25, 2014 appointment, P.A. Kowalchuk also referred plaintiff for a podiatry consultation, and ordered standard tests used in treating diabetes, including an HAIC blood test; a comprehensive metabolic panel to check for blood sugar, liver, kidney function, and electrolyte levels; a complete blood count with a differential; a urinalysis for random protein and microalbumin; and a regular urinalysis for proper hydration and diet monitoring and control.  Id. ¶ 31.  P.A.

Kowalchuk ordered plaintiff's prescriptions for Enalapril, to treat high blood pressure and diabetic kidney disease, and Zantac, to treat his acid reflux. Id. ¶ 32.

P.A. Kowalchuk next met with plaintiff on February 27, 2014, wherein plaintiff complained that he had not received his diabetic diet with an evening snack. Kowalchuk Decl. ¶ 34. P.A. Kowalchuk recommended that plaintiff receive the diabetic diet meal and ensured that the mess hall and security staff were notified that plaintiff was to start this meal immediately. Id. ¶¶ 35, 36. P.A. Kowalchuk noted plaintiff's blood sugar levels, and provided him with a tube of glucose gel to use if needed. Id. ¶¶ 45, 46.

On April 14, 2014, P.A. Kowalchuk discontinued plaintiff's physical therapy for his hand after twelve visits because plaintiff was able to perform the physical therapy exercises in his cell. Kowalchuk Decl. ¶¶ 50, 51. She also prescribed plaintiff a warm pack to apply to his hands, and rescheduled plaintiff's appointment for a urine specimen. Id. ¶¶ 52, 53. Two days later, P.A. Kowalchuk restarted plaintiff's Metformin prescription at 500mg twice a day, and decreased his Lantus insulin to ten units daily at nighttime with a finger stick. Id. ¶ 54. On July 2, 2014, after reviewing nurse Atkinson's notes, P.A. Kowalchuk recommended holding to sliding scale and regular insulin between 6 a.m. through 4 p.m., and to continue plaintiff's Lantus insulin and blood sugar checks at nighttime. Id. ¶ 57. She also ordered that nurses administer plaintiff ten units of Lantus insulin via subcutaneous shot at nighttime. Id. ¶ 58. In June 2014, P.A. Kowalchuk advised plaintiff of the consequences of a Ramadan diet for diabetic patients. Id. ¶¶ 59, 62.

Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's statements are consistent with plaintiff's medical records and his "Referral History," which establish that defendants

45

routinely attempted to regulate plaintiff's fluctuating blood sugar levels with a treatment plan that included standard medications and referrals to specialized providers.  See Dkt. Nos. 121-25, 121-30, 121-34 ("Pl. Med. Rec.") at 5, 9-10, 26, 32, 37, 41, 45, 47, 49, 53, 55, 58, 60-61, 63-64, 66-68, 71, 73-74, 77-78, 81, 85, 87-90, 92, 94, 96-97, 101, 102, 104, 106-08 (detailing plaintiff's medical history from these doctors); see generally Dkt. Nos. 121-26, 121-31 (detailing plaintiff's consultation report records).  Moreover, the record indicates that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk scheduled plaintiff for endocrinology and podiatry consultations, and attempted to adjust his medication to meet his diabetic needs, and that plaintiff ultimately refused this treatment.  See Pl. Med. Rec. at 5, 9, 16, 26, 32, 40, 42, 48-49, 66-67, 71, 73-74, 77-79, 81, 85, 88-92, 102, 104 (detailing plaintiff's medication and referral refusals); see also Dkt. No. 121-27 at 3-69 (compiling plaintiff's Refusal of Medical Examination and/or Treatment forms); Dkt. No. 121-26 at 30-31 (detailing plaintiff's cancelled consultations).  There is no indication in the record that Dr. Mandalaywala discontinued plaintiff's xerosis treatment.

To the extent that plaintiff believed that different treatment would remedy his diabetes symptoms, this belief does not amount to inadequate medical care as plaintiff's concerns constitute nothing more than a mere disagreement with Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's treatment plans, which is not actionable under the Eighth Amendment.  See Randle, 960 F. Supp. 2d at 481 (quoting Alston v. Bendheim, 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009) ("Indeed, '[a]n inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.'").  Accordingly, plaintiff has failed to establish that Dr.

Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk deprived him of adequate medical care under the objective prong of the deliberate indifference analysis.

### b. Subjective Component

Although plaintiff fails to establish the objective component of the deliberate indifference test, and plaintiff must demonstrate both prongs to state a deliberate indifference claim, Hathaway, 37 F.3d at 66, for the sake of a complete analysis, the undersigned addresses the subjective component. Plaintiff fails to establish that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk knew of and disregarded an "excessive risk" to his health under the subjective component. Farmer, 511 U.S. at 837. The record demonstrates that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk addressed plaintiff's diabetes symptoms through medication, as well referrals for endocrinology and podiatry consultations. See subsection II.C.1.a. supra, at 42-47. Based on their own assessments of plaintiff's medical records, as well as the blood sugar tests conducted at Upstate, Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk determined a combination of regular insulin, sliding scale, Metformin, and Lantus insulin was the appropriate plan to treat plaintiff's diabetes. See Mandalaywala Decl. ¶ 62; Schroyer Decl. ¶ 88; Kowalchuk Decl. ¶¶ 65-66. In response to plaintiff's noncompliance with the treatment plan, Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk attempted to adjust plaintiff's medication with the hope that he would be able to abide by the plan. See Mandalaywala Decl. ¶ 65; Schroyer Decl. ¶ 91; Kowalchuk Decl. ¶ 68. Inmates do not have a constitutional right to the treatment of their choice. See Wright, 694 F. Supp. 2d at 155 (citing Dean v. Coughlin,

47

804 F.2d 207, 215 (2d Cir. 1986) ("[That the plaintiff] preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.").  That plaintiff believed his diabetes required more or different treatment does not render  Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's denial of that treatment an Eighth Amendment violation.  See Randle, 960 F. Supp. 2d at 481 ("[A] difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.") (internal citations and quotation marks omitted).

Further, to the extent that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's treatment plan to manage his diabetes differed from that of other medical providers at previous facilities, this allegation does not amount to a constitutional violation.  See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted).  To the extent that plaintiff contends that P.A. Kowalchuk discontinued his physical therapy, P.A. Kowalchuk declared she did so after plaintiff had attended twelve physical therapy sessions, and believed that it was appropriate because plaintiff could engage in the physical therapy exercises in his cell.  Kowalchuk Decl. ¶ 50. She also provided plaintiff warm packs to apply to his hands.  Id.  Thus, it was P.A. Kowalchuk's professional medical opinion that plaintiff's physical therapy visits could be terminated; that plaintiff disagreed amounts to nothing more than mere disagreement, which is not actionable under the Eighth Amendment.  See Chance, 143 F.3d at 703.

Moreover, to the extent that plaintiff refused his medication, scheduled endoscopy

and podiatry consultations, and other treatment offered by defendants, see Pl. Med. Rec. at 5, 9, 16, 26, 32, 40, 42, 48-49, 66-67, 71, 73-74, 77-79, 81, 85, 88-92, 102, 104, it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs." Nelson v. Deming, 140 F. Supp. 3d 248, 261 (W.D.N.Y. 2015) (citing Jones v. Smith, 784 F.2d 149, 152 (2d Cir. 1986)).

Even if Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's decisions caused plaintiff unintended harm, negligence[13] is not actionable under section 1983.  See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F. Supp. 3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference.").  Thus, plaintiff has not demonstrated the existence of a material question of fact whether Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk knew of and disregarded an excessive risk to his health or safety.  See Farmer, 511 U.S. 837.  Plaintiff fails to establish that Dr. Mandalaywala, Dr. Schroyer, or P.A. Kowalchuk knew of and disregarded an "excessive risk" to his health" under the second prong of the deliberate indifference test.

Accordingly, plaintiff has failed to demonstrate that Dr. Mandalaywala, Dr. Schroyer,

---

[13] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

and P.A. Kowalchuk were deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion on this ground be granted.

## 2. Nurses Atkinson, Bergeron, Wilson, and Sturgen

### a. Objective Component

Plaintiff has not demonstrated that Ms. Atkinson, Ms. Bergeron, Ms. Wilson or Ms. Sturgen deprived him of adequate medical care.  As a preliminary matter, it is well-established that registered nurses have

> no authority to: (1) prescribe or discontinue an inmate's medication (including insulin), dietary plans or special diabetic diets; (2) refer an inmate for physician approved testing procedures such as a colonoscopy, endoscopy, CT scan, MRI, EEG, EKG or a consultation with a specialist such as a podiatrist, opthamologist or endocrinologist; or (3) request special issue medical boots or shoes, including insoles.

Dkt. No. 121-35 ("Sturgen Decl.") ¶ 12; Dkt. No. 121-39 ("Atkinson Decl.") ¶ 12; Dkt. No. 121-41 ("Bergeron Decl.") ¶ 14; Dkt No. 121-44 ("Wilson Decl.") ¶ 13.  As to medical services, nurses may only administer the medications that the treating physician has prescribed for the inmate in the amounts and frequencies prescribed; nurses do not have the authority to modify or otherwise alter that prescription.  Sturgen Decl. ¶ 15; Atkinson Decl. ¶ 13; Bergeron Decl. ¶ 15; Wilson Decl. ¶ 15.  Nurses may provide certain over-the-counter medications to inmates, including glucose gel, Aspirin, Tylenol, Ibuprofen, Antacid tablets, and Anti-Fungal creams and/or lotions.  Sturgen Decl. ¶ 16; Atkinson Decl. ¶ 14; Bergeron Decl. ¶ 16; Wilson Decl. ¶ 16.  Thus, to the extent that plaintiff may contend that Ms. Atkinson, Ms. Bergeron, Ms. Wilson or Ms. Sturgen denied him adequate medical care

50

by failing to provide him with certain medications or changes in his insulin and refer him for outside procedures, his claims cannot stand as Nurses Atkinson, Bergeron, Wilson, and Sturgen lacked the authority to do so. See Alston v. Howard, 925 F. Supp. 1034, 1040 n.6 (S.D.N.Y. 1996) ("In addition, [the plaintiff] fails to state a claim against Nurse Howard, who had no authority to prescribe or deny him special footwear. As set forth above, prescriptions must be approved by the Facility Health Services director.").

As to plaintiff's remaining claims, the record indicates that Ms. Atkinson, Ms. Bergeron, and Ms. Wilson met with plaintiff on numerous occasions during sick call and routinely evaluated plaintiff's symptoms, administered insulin to regulate plaintiff's blood sugar levels, and provided plaintiff with over-the-counter medications, such as Eucerin and glucose gel, when necessary. See Atkinson Decl. ¶ 18; Bergeron Decl. ¶ 19; Wilson Decl. ¶ 20; see, e.g., Pl. Med. Rec. at 7, 9-12, 14-16, 18-20, 23-24, 26-27, 29, 31-37, 39-43, 45-47, 49-53, 55-56, 58-69, 71-72, 76-93, 95-102, 108 (demonstrating examples of Ms. Atkinson, Ms. Bergeron, and Ms. Wilson's treatment of plaintiff). The record demonstrates that Ms. Sturgen only met with plaintiff on two occasions: (1) on September 26, 2015, she noted that plaintiff had been seen by podiatry for treatment and removal of bilateral ingrown toenails; and (2) on December 11, 2014, she noted that plaintiff had been seen by optometry, had no prescription for eyeglasses, and was to follow-up in one year. See Sturgen Decl. ¶¶ 18-20; see also Pl. Med. Rec. at 9, 29. Where Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, and Ms. Wilson did not have the authority to meet plaintiff's needs, they included his request for referrals to specialists and other concerns in his medical chart so that plaintiff's treating provider could evaluate the need for those treatments. See, e.g.,

Pl. Med. Rec. at 41 ("Requesting lotion for feet . . . has [primary care provider] appt sched. soon"); see also Sturgen Decl. ¶ 31; Atkinson Decl. ¶ 33; Bergeron Decl. ¶ 45; Wilson Decl. ¶ 30 (establishing the nurses policy of writing down plaintiff's complaints to be addressed by his primary care provider).  Accordingly, plaintiff has failed to establish that Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson deprived him of adequate medical care under the objective prong of the deliberate indifference analysis.

### b. Subjective Component

Although plaintiff fails to establish the objective component, for the sake of a complete analysis, the undersigned addresses the subjective component.  Plaintiff fails to establish that Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson knew of and disregarded an "excessive risk" to his health" under the second prong.  Farmer, 511 U.S. at 837.  The record demonstrates that  Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, and Ms. Wilson addressed plaintiff's complaints to the extent they had the authority.  See subsection II.C.2.a. supra, at 50-52.  Insofar as plaintiff refused sick call or refused to comply with the treatment and medications prescribed to him, see Atkinson Decl. ¶ 19, 21, 23, 24, 25, 27, 28, 29, 30; Bergeron Decl. ¶¶ 20, 21, 22, 35, 37; Wilson Decl. ¶ 24, 27,  it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs." Nelson, 140 F. Supp. 3d at 261 (citing Jones, 784 F.2d at 152).  As to plaintiff's allegation that Ms. Sturgen, as Acting Nurse Administrator, "deliberate[ly] prepar[ed] [ ] subjective/subversive investigation reports for . . . plaintiff's medical grievance," Am. Compl.

¶ 39, Ms. Sturgen declared that she authored an investigative report dated April 11, 2014, which addressed plaintiff's claims that he had received inadequate medical care for his diabetes.  Sturgen Decl. ¶¶ 26, 27.  Ms. Sturgen declared that he "appeared to [her] that plaintiff was receiving appropriate medical care for his diabetes in accordance with Dr. Mandalaywala's prescribed treatment[,]" and such treatment was in keeping with the community standard of care.  Id. ¶ 29.  Thus, there is no indication that, in authoring the report, Ms. Sturgen was "actually aware of a substantial risk that serious inmate harm will result," as she declared that she believed Dr. Mandalaywala followed the community standard of care.  Farmer, 511 U.S. at 837.

Insofar as plaintiff takes issue that Ms. Bergeron required him to state his Department Identification number, or DIN number, prior to receiving his medications, see Am. Compl. ¶ 33, Ms. Bergeron declared that inmates at Upstate are required to state their DIN numbers prior to receiving their medications to "ensure that the medications that are administered to each inmate are in fact [the] medications that have been ordered for that inmate."  Bergeron Decl. ¶¶ 29, 30.  She further declared that an inmate's refusal to state his or her DIN prior to receiving medication constituted a refusal of that medication.  Id. ¶ 31.  Thus, plaintiff's refusal to state his DIN number represented a refusal of his medication, and indicates that Ms. Bergeron was not deliberately indifferent to his medical needs.  See Nelson, 140 F. Supp. 3d at 261 (citing Jones, 784 F.2d at 152).  Further, to the extent that plaintiff suggests that Ms. Bergeron "posted [a] food restriction sign on the front of plaintiff's cell door which resulted in him being deprived of fast acting carbohydrates," Am. Compl. ¶ 33, Ms. Bergeron declared that she does not have the

authority to order a dietary restriction for an inmate.  Bergeron Decl. ¶ 25.  Further, the Upstate Inmate Grievance Review Committee ("IGRC") found that Dr. Schroyer had placed a dietary restriction order for plaintiff on April 27, 2014 that requested plaintiff not be provided with jelly, sugar, or juice to combat his fluctuating blood sugar levels.  See id. ¶¶ 26, 27; Schroyer Decl. ¶ 54 ("The decision to deny plaintiff jelly, juice, or sugar was a reasonable measure to try to treat plaintiff's diabetes."); see also Dkt. No. 121-32 at 3-13 (providing the grievance paperwork regarding the alleged denial of juice, sugar, and jelly).

Even if Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson's decisions caused plaintiff unintended harm, negligence[14] is not actionable under section 1983.  See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted).  Thus, plaintiff has not demonstrated the existence of a material question of fact whether Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson knew of and disregarded an excessive risk to his health or safety.  See Farmer, 511 U.S. 837.  Accordingly, plaintiff has failed to demonstrate that defendants were deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion on this ground be granted.

### D. First Amendment

Plaintiff claims that C.O. Richards "terminated [his] podiatry consultation from the

---

[14] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

outset for his invocation of [the] right to private medical consultation[15] . . . and further act of retaliation [was] committed with misbehavior report proven to be fabricated, prepared against plaintiff."  Am. Compl. at 10.  Defendants argue that plaintiff has failed to introduce sufficient evidence to support his retaliation claim; specifically, that plaintiff has failed to establish that he was engaged in a protected activity.  Def. Mem. of Law at 12-15.  Courts are to "approach  [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'"  See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009)

---

[15] To the extent that plaintiff may attempt to set forth a right to privacy claim, the undersigned determines that it must fail.  "There is a constitutional right of privacy  that protects the individual interest against disclosure of personal matters such as one's medical condition."  Shuler v. Brown, No. 07-CV-0937, 2009 WL 790973, at *5 (N.D.N.Y. Mar. 23, 2009) (citing Whalen v. Roe, 429 U.S. 589, 598-600 (1977).  This protection has been extended to prisoners.  See id. (citation omitted).  There is no absolute right to privacy regarding an inmate's medical condition; instead, the privacy interest is determined on the prisoner's medical condition.  See id. (citation omitted).  "This privacy interest is at its zenith when the prisoner suffers from an 'unusual' condition, such as HIV or transsexualism, that is 'likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.'"  Id. (quoting Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999)).  Here, there is no indication that plaintiff's diabetic condition is "unusual" in the same vein as HIV or transsexualism, or that it is "likely to provoke an intense desire to preserve one's medical confidential," or cause hostility or intolerance from others.  Id.  As such, plaintiff fails to set forth a right to privacy claim.

(quoting <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 380 (2d Cir. 2004), <u>overruled on other grounds by Swierkiewicz</u>, 534 U.S. at 560).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. Plaintiff seems to suggest that his request for a private medical consultation so that both of his feet could be examined amounted to protected conduct under the First Amendment. <u>See</u> Am. Compl. ¶ 19, at 10. The undersigned notes that plaintiff's allegation is "not the typical protected speech most commonly considered protected, i.e., bringing a lawsuit against a defendant or petitioning the government for redress of grievances." <u>Maxwell v. City of New York</u>, 272 F. Supp. 2d 285, 300 (S.D.N.Y. 2003), <u>vacated in part on other grounds</u>, 380 F.3d 106 (2d Cir. 2004) (citing <u>Colon v. Coughlin</u>, 58 F.3d 865, 871 (2d Cir. 1995)). Moreover, neither party has proffered case law that suggests that plaintiff's request for a private medical consultation amounts to protected conduct.[16] To the extent that plaintiff contends that his demand that the doctor treat his left root constitutes protected conduct, the Second Circuit has not decided "whether the First Amendment confers on a prisoner the right to demand necessary medical attention[.]" <u>Brown v. White</u>, No. 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010) (citing cases).

Even assuming for the purpose of this motion that plaintiff's request constitutes protected activity, plaintiff's retaliation still must fail. "[T]he mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to [a] level

---

[16] Plaintiff offers case law pertaining to his right to privacy, which is inapplicable to his retaliation claim.

of constitutional significance." Reed v. Doe No. 1, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (citing Boddie, 105 F.3d at 862). However, a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation. Id. (citing Franco v. Kelly, 854 F.2d 584, 589 (2d. Cir 2008)). In order to prove an adverse action, a plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.'" Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93). The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. N.Y., 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

The record demonstrates that on March 21, 2014, C.O. Richards escorted plaintiff to his podiatry consultation. See Dkt. No. 121-22 ("Richards Decl.") ¶¶ 4, 6-7. During the

consultation, C.O. Richards instructed plaintiff to remove only his right boot and sock.  Id.

¶ 9.  Plaintiff attempted to also remove his left boot and sock, stating that he wanted the

doctor to examine his left foot.  Id.  C.O. Richards issued "several direct orders" that plaintiff

only remove his right boot and sock.  Id.  Plaintiff refused to comply with the direct order,

and the consultation was terminated.  Id.  C.O. Richards therein issued plaintiff a

misbehavior report.  Id.

     The undersigned finds that plaintiff has failed to allege  that his request for a private

medical consultation was the substantial or motivating factor in C.O. Richard's issuance

of the misbehavior report.  See Gayle, 313 F.3d at 682.  In fact, the record demonstrates

that C.O. Richards issued plaintiff the misbehavior report because he failed to comply with

his direct order to only remove his right boot and sock, and thus, interfered with the doctor's

examination.  See Richards Decl. ¶ 12; Dkt. No. 121-23 at 2-3 (C.O. Richards' misbehavior

report).  C.O. Richards declared that he was unaware of plaintiff's underlying medical

condition, and did not know the details of his medical appointment.  Richards Decl. ¶ 12.

Plaintiff has failed to proffer evidence suggesting otherwise.   Moreover, plaintiff testified

that, at the podiatry consultation, C.O. Richards instructed him to remove only his right boot

and sock, but that he insisted on removing both his left and right boots and socks.  See Pl.

Dep. at 61-62.  Thus, as plaintiff admits that he attempted to remove both of his boots and

socks after C.O. Richards ordered him to only remove his right boot and sock, there is no

dispute that plaintiff committed the conduct charged and that C.O. Richards had a non-

retaliatory justification to issue the misbehavior report.  See Roseboro, 791 F. Supp. 2d at

373 (citing inter alia Chavis v. Goord, 333 F. App'x 641, 644 (2d Cir. 2009) (summary

order) ("[T]he defendants were entitled to summary judgment because there were non-retaliatory reasons for their conduct, where [the plaintiff] did not dispute that he had disobeyed orders, which was, in part, the basis for the misbehavior reports.").

Accordingly, as plaintiff has failed to set forth a prima facie claim for retaliation, and defendants have demonstrated that, absent any alleged retaliatory motive, C.O. Richard would have issued plaintiff a misbehavior report, it is recommended that defendants' motion on this ground be granted.

### E. Fourteenth Amendment

Plaintiff contends that Lt. Trombly violated his right to procedural due process by "dishonestly suppress[ing] documentary evidence and den[ying] a witness necessary to disprove charges supposedly violated by plaintiff." Am. Compl. at 11. Plaintiff claims that Director Venettozzi violated his due process rights by affirming the disciplinary disposition on appeal. Id. at 14. Defendants argue that plaintiff's due process claims must fail. Def. Mem. of Law at 15-19. The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. To state a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest

cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### 1. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486) ("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous."). The Second Circuit has held that SHU confinement "for fewer than 101 days under 'normal' SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest." Nieves v. Prack, 172 F. Supp. 3d 647, 651 (W.D.N.Y. 2016) (citing Ortiz v. McBride, 380 F.3d 649, 654-55 (2d Cir. 2004)).

Here, plaintiff's three month confinement in SHU "implicates a liberty interest only if it was under 'abnormal or unusual SHU conditions.'" Nieves, 172 F. Supp. 3d at 652

(quoting <u>Ortiz</u>, 380 F.3d at 654).  Plaintiff contends that he suffered "atypical hardship," including "filthy cells, unlawful deprivation of publications (i.e., Hip Hop Weekly magazines); haircut services administered by uncertified barbers; law library request[s] being process[ed] by unskilled clerks; deprivation of photo services and semi-contact during visits; insufficient quantity of meals served . . . ."  Am. Compl. ¶ 47.  The undersigned finds that plaintiff's claims concerning publications, haircuts, law library requests, photo services, and contact visits fail to amount to an atypical hardship.  <u>See</u> <u>Carter v. Carriero</u>, 905 F. Supp. 99, 103-04 (W.D.N.Y. 1995) (holding that limited law library access due to SHU disciplinary segregation does not result in an atypical, significant deprivation); <u>Zappulla v. Fischer</u>, No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *7 (S.D.N.Y. Apr. 5, 2013) (concluding that a denial of a haircut, which is more severe than plaintiff's allegation, is insufficient to raise a due process claim); <u>White v. Fischer</u>, No. 9:09-CV-240, 2010 WL 624081, at *6 n.8 (N.D.N.Y. Feb. 18, 2010) (determining that the plaintiff's allegations that he was not permitted to take photographs or have the same opportunities for social interaction does not implicate his liberty interest); <u>Hernandez v. Sposato</u>, No. 14-CV-4593 (JFB)(ARL), 2015 WL 4097784, at *4 (E.D.N.Y. July 8, 2015) ("With respect to the contact visits at issue in this case, courts in the Second Circuit have consistently held that [ ] the Due Process Clause . . . [does not] create a protected liberty interest for inmates with respect to contact visits.") (citation omitted); <u>Fox v. Lee</u>, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 1211111, *18 (N.D.N.Y. Feb. 5, 2018) (concluding that "inmates do not have a constitutional right to privileges such as reading materials.") (citing <u>Montalvo v. Lamy</u>, 139 F.Supp.3d 597, 605 (W.D.N.Y. 2015) ("[P]risoners have no constitutional right to access

a commissary."); Rosales v. LaValley, No. 9:11-CV-106 (MAD/CFH), 2014 WL 991865, at *11 (N.D.N.Y. Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to watch television because the amenity is not considered a necessity for inmates.")).

To the extent that plaintiff contends that he was exposed to "filthy cell" conditions, the undersigned concludes that this claim cannot stand. Although courts have held that exposure to unclean cells may constitute a deprivation of a liberty interest, whether a liberty interest is implicated depends on the level and duration of the exposure. Compare Florio v. Canty, 954 F. Supp. 2d 227, 235 (S.D.N.Y. 2003) (concluding that the plaintiff's exposure to waste in his cell was "only for brief periods" totaling "less than a few hours," and, therefore, "simply too minor to" constitute atypical and significant conditions) with Gaston v. Coughlin, 249 F.3d 156, 165-66 (2d Cir. 2001) (holding that the plaintiff's exposure to "human feces, urine, and sewage water" for "several consecutive days" constituted an atypical and significant condition). Plaintiff does not specify what constituted a "filthy cell," nor does he allege how long the exposure occurred. As plaintiff as failed to establish that his alleged "filthy cell" conditions amounted to a deprivation of a liberty interest, the undersigned concludes that his claim does not amount to an atypical hardship.

Insofar as plaintiff contends that he received an "insufficient quantity of meals served -in an inappropriate condition at times," Am. Compl. ¶ 47, the undersigned notes that plaintiff does not allege that he was outright deprived of food, which may constitute a liberty interest. See Brooks v. Chappius, 450 F. Supp. 2d 220, 224 (W.D.N.Y. 2006) ("Deprivation of food, even for relatively brief periods, can therefore give rise to a liberty interest.").

Rather, plaintiff claims that he was sometimes provided "insufficient quantity of meals" in an "inappropriate condition."  Am. Compl. ¶ 47.  Although a plaintiff's dislike of food or the occasional presence of spoiled food generally does not result in an atypical confinement, if a plaintiff alleged that his meals were regularly spoiled or improperly prepared, and as a result, he or she became sick, this would result in an atypical or significant hardship.  See Lunney v. Brureton, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2006) ("Insofar as [the plaintiff] alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a case of action . . . . Here, however [the plaintiff] alleges that his meals were regularly spoiled and/or improper prepared ... [and] eating the meals caused him to get sick . . . .").  Nor does plaintiff suggest that the meals provided to him while housed in SHU affected his health or his diabetes management.  Plaintiff has failed to demonstrate that his alleged inappropriately prepared meals amounted to a deprivation of a liberty interest, and, therefore, do not constitute an atypical hardship.

Finally, to the extent that plaintiff contends that he was provided "discriminatory/inadequate medical care as well as invasion of privacy during medical consultations," Am. Compl. ¶ 47, the undersigned has already concluded that plaintiff has failed to establish that defendants provided him with inadequate medical care.  See subsection II.C. supra, at 39-54.

Even though plaintiff's conditions of his confinement "were less than ideal, he has not shown that they were so atypical compared to ordinary prison life as to give rise to a protected liberty interest."  Allah v. Poole, 506 F. Supp. 2d 174, 191 (W .D.N.Y. 2007).  As

such, it is recommended that defendants' motion on this ground be granted.

## 2. Procedural Due Process

Even assuming that plaintiff had adequately pleaded a liberty interest, his claims still must fail as plaintiff fails to demonstrate that he was deprived of that interest due to insufficient process.  See Giano, 238 F.3d at 225.  Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply."  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU.  Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citations omitted).

Plaintiff's due process claims center on his inability to call witnesses and present documentary evidence at the April 1, 2014 disciplinary hearing.  See Am. Compl. at 11.

As to plaintiff's alleged inability to call witnesses, the record demonstrates that Lt. Trombly called C.O. Richards to testify at the disciplinary hearing, and afforded plaintiff the opportunity to ask him questions. Dkt. No. 121-23 at 9-16.  C.O. Richards testified that he escorted plaintiff to his podiatry call out on March 21, 2014. Id. at 10.  C.O. Richards asked the nurse and the doctor what restraints and/or clothing items needed to be removed for the doctor's examination.  Id.  The doctor stated that only plaintiff only needed to remove

64

his right shoe.  C.O. Richards instructed plaintiff to remove his right shoe, and plaintiff complied.  Id.  Plaintiff then attempted to remove his left shoe.  Id.  C.O. Richards instructed plaintiff only to remove his right shoe.  Id.  C.O. Richards again confirmed with the doctor that only the right shoe needed to be removed.  Id.  Plaintiff continued to attempt to take off his left shoe, and C.O. Richards terminated the call out.  Id.  When plaintiff requested the names of the doctor and nurse in the room, C.O. Richards informed him that he did not know the name of the podiatrist because he was an outside specialist, but that he believed the nurses name was "Robertson."  Id. at 11-12.

Plaintiff then requested the following witnesses: (1) any inmates on call out; (2) the doctor; and (3) the nurse.  See Dkt. No. 121-23 at 17.[17]  Lt. Trombly produced Ms. Robertson,[18] and afforded plaintiff the opportunity to ask her questions.  See id. at 18-24. Ms. Robertson testified that "[i]f a consult is written for your right foot, you're there for your right foot.  The doctor is not going to examine your left foot, if the consult is written for your right foot."  Id. at 20.  When questioned whether she heard the direction that the doctor gave C.O. Richards with regard to how he wanted plaintiff to prepare for the examination, Ms. Robertson testified that the doctor requested that plaintiff remove his right boot.  Id. at 23.  Plaintiff then requested that the doctor be called as a witness.  Id. at 24.[19]  Lt. Trombly

---

[17] Plaintiff does not challenge that Lt. Trombly failed to call the inmate witnesses.

[18] Plaintiff incorrectly referred to Ms. Robertson as a nurse; she is a senior x-ray technician.  See Robertson Decl. ¶ 5-9.

[19] There is some discrepancy in the record as to the name of the doctor requested.  Plaintiff's amended complaint contends that he requested the testimony of Dr. Lentini.  Am. Compl. ¶¶ 24-25. However, Lt. Trombly's declaration seems to suggest that the podiatrist's name was Dr. Langstein.  See Dkt. No. 121-20 ("Trombly Decl.") ¶¶ 52-53.

denied plaintiff's request because his testimony would be "a repetition of what the nurse just testified to." Id. When plaintiff continued to request the doctor to determine whether he directed plaintiff to remove only his right boot, Lt. Trombly stated that "the nurse who acted as a witness said she heard the doctor give him that direction. That's adequate I don't need repitition." Id. at 25.

Based on the abovementioned facts, the undersigned concludes that Lt. Trombly's denial of plaintiff's request to call the doctor as a witness does not amount to a due process violation. Although it is well-established that inmates are entitled to a reasonable opportunity to call witnesses, see Luna, 356 F.3d at 487, "this right is not unfettered . . . [and] may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance of lack of necessity." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *28 (N.D.N.Y. Mar. 28, 2014) (citations omitted). "While inmates are entitled to call witnesses at disciplinary hearings, hearing officers may deny witness testimony as irrelevant or redundant." Richard v. Fischer, 38 F. Supp. 3d 340, 359 (W.D.N.Y. 2014) (citation omitted). The Second Circuit has held that it is the prison official's burden to establish the rationality of declining an inmate's witness request. See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991). To satisfy this burden, the prison official must provide "some explanation" during or after the hearing as to why he or she declined the witness. See Russell v. Selsky, 35 F.3d 55, 58 (2d Cir. 1994). "While prison officials need not put their reasons for refusing the inmate's request in writing or into the administrative record of the disciplinary hearing, due process does require that prison officials 'at some point' state their reasons for refusing the inmate's request." Gonzalez v.

66

Chalk, No. 13 Civ. 5486(PKC), 2014 WL 1316557, at *5 (S.D.N.Y. Apr. 1, 2014) (citing

Ponte v. Real, 471 U.S. 491, 492 (1985)).

It is clear from the disciplinary hearing transcript that Lt. Trombly provided plaintiff

with "some explanation" as to why he denied the doctor as a witness; he instructed plaintiff

on two occasions that he found the doctor's potential testimony to be repetitive of testimony

already provided by Ms. Robertson.  Dkt. No. 121-23 at 23, 25.  As it is within the hearing

officer's purview to deny a witness based on irrelevance or lack of necessity, see Kingsley,

937 F.2d at 30, and because the pleadings demonstrate that Lt. Trombly offered "some

explanation" as to why he denied the request, the undersigned finds that Lt. Trombly has

"adequately demonstrated the rationality of declining to call" the doctor.  Gonzalez, 2014

WL 1316557, at *5.  As such, it is recommended that defendants' motion on this ground

be granted.

As to plaintiff's request for certain documentary evidence, including the podiatrist call

out sheet, the infirmary "escort officer job description and disposition guidelines," and the

"consultation report and patient Bill of Rights," plaintiff's Assistant Form demonstrates that

the inmate assistant informed plaintiff that he could access a majority of the documents

through the Freedom of Information Law ("FOIL").  Dkt. No. 121-21 at 31.  The inmate

assistant denied plaintiff's request for the escort officer job description.  Id.  Plaintiff again

requested this documentary evidence at the April 1, 2014 disciplinary hearing, and Lt.

Trombly informed him that the inmate job description request had been denied because

it was not relevant to the underlying charges at the hearing, and that the inmate assistant

had instructed plaintiff to FOIL the remaining documents.  See Dkt. No. 121-23 at 9.

67

"Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal and undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence."  Wolff, 418 U.S. at 566.  Plaintiff has not proffered evidence that he filed a FOIL request in relation to the documents he requested for the April 1, 2014 disciplinary hearing.  Moreover, Lt. Trombly advised plaintiff at the disciplinary hearing that the job description request had been denied because it was irrelevant to the hearing.  See Dkt. No. 121-23 at 9.  As plaintiff failed to provide evidence establishing that he attempted to FOIL the requested documents, and because Lt. Trombly apprised plaintiff as to why the job description request had been denied, it is recommended that defendants' motion on this ground be granted.

In sum, the record demonstrates that Lt. Trombly's determination of guilt was based on "some evidence" as set forth in Superintendent, Mass. Corr. Inst. v. Hill.  472 U.S. 445, 455-56 (1985) (concluding that the "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board.").  The transcript demonstrates that Lt. Trombly stated, on-the-record, that in finding plaintiff guilty of failure to obey a direct order (106.10), he relied on plaintiff's "own testimony admitting that he failed to follow direction, the testimony of the author, C.O. Richards, and the testimony from the Tech [Robertson] who was a witness to the incident."  Dkt. No. 121-23 at 29.  Thus, the record indicates that Lt. Trombly's disciplinary disposition

was supported by some evidence.

The undersigned notes that the only claim against Director Venettozzi is that he upheld Lt. Trombly's disciplinary determination on appeal when he had "specific acquisition and knowledge of the clear and obvious due process violations, which after being informed of the violations he failed to remedy the wrong" and allowed plaintiff's continued confinement. Am. Compl. at 14. As the undersigned recommends dismissal of plaintiff's due process claim against Lt. Trombly because he fails to establish a constitutional violation, it is similarly recommended that plaintiff's due process claim against Director Venettozzi be dismissed.

Accordingly, it is recommended that defendants' motion be granted.


**F. Qualified Immunity**

Defendants argue that, even if plaintiff's claims are substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 19-20. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d

922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test.  See subsection II.B.-E. supra, at 30-69.  Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation.  See Aiken, 236 F. Supp. 2d at 230.  Accordingly, it is recommended that defendants' motion on this ground be granted.


## G. State Law Claims

Defendants argue that plaintiff's state law claims for negligence and medical malpractice are barred by N.Y. Correction Law § 24.  See Def. Mem. of Law at 20-21.  This Court previously dismissed plaintiff's state law claims of "ministerial negligence" and breach of duty against DOCCS in its July 15, 2015 Decision and Order.  See Dkt. No. 15 at 16. However, to the extent that any state law claims remain against the individual defendants, these claims must be dismissed.

The undersigned recommends dismissal of plaintiff's state law claims concerning negligence and medical malpractice in light of the recommendation of dismissal of the

federal Eighth Amendment claims pertaining to the same set of facts.  See 28 U.S.C. § 1367(c)(3) (stating that the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997); Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994).

Even if the underlying federal cause of action survived, plaintiff's state law claim is still subject to New York Correction Law § 24.  Pursuant to Correction Law § 24(1):

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

N.Y. CORR. LAW § 24(1).  Courts look at the following factors to determine whether a defendant's action is within the scope of employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in the actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have reasonably anticipated.

Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted) (holding that the defendant's alleged sexual harassment was not undertaken in the discharge of his duties and beyond the protection afforded to officers under § 24).

The test to determine whether the defendants' actions fall within the scope of their employment is "whether the act was done while the servant was doing his master's work

no matter how irregularly, or with what disregard of the instructions." Cruz v. New York, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citing Cepeda v. Coughlin, 128 A.D.2d 995, 996 (N.Y. App. Div. 1987)).  Conduct that is "purely for personal reasons unrelated to the employer's interests, . . . which is a substantial departure from the normal methods of performing the officer's duties is not considered within the scope of employment." Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision, No. 11-CV-079S, 2013 WL 5347468, at *2 (W.D.N.Y. Sept. 23, 2013) (quoting Gore v. Kuhlman, 217 A.D.2d 890, 891 (N.Y. App. Div. 1995)).

Plaintiff's complaint demonstrates that defendants were on duty in the correctional facility at the time of the alleged constitutional violations, and that their alleged acts were not significant departures beyond the scope of their employment.  Accordingly, the undersigned recommends dismissal of plaintiff's state law claims.

## H. Revocation of Plaintiff's In Forma Pauperis Status

As an alternative to dismissal on the merits, defendants seek revocation of plaintiff's in forma pauperis ("IFP") status under 28 U.S.C. § 1915(g), which bars prisoners from proceeding IFP after three or more previous claims have been dismissed as frivolous, malicious, or for failing to state a claim. See 28 U.S.C. § 1915(g) (2006).[20] See Def. Mem.

---

[20] 28 U.S.C. § 1915(g) provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under

of Law at 21-24.  Plaintiff does not address this argument.  Frivolous claims "lack[ ] an arguable basis either in law or in fact."  Tafari v. Hues, 473 F.3d 440, 442 (2d Cir.2007) (quoting Neitzke v. Williams, 490 U.S. 319, 325 (1989)).  Malicious claims are filed with the intent to hurt or harm another.  Id. (citations omitted).  The failure to state a claim applies a parallel definition from Fed. R. Civ. P. 12(b)(6), but "it does not follow that a complaint which falls afoul of the [12(b)(6) motion to dismiss] standard will invariably fall afoul of the [§ 1915(g) standard]."  Neitzke, 490 U.S. at 326; see also Tafari, 473 F.3d at 442 (citations omitted).

This "three-strikes" provision contains a narrow exception which permits suits, notwithstanding prior dismissals, when the prisoner is "under imminent danger of serious physical injury."  28 U.S.C. § 1915(g); see also Lewis v. Sullivan, 279 F.3d 526, 531 (7th Cir. 2002) (applying imminent danger exception "[w]hen a threat or prison condition is real and proximate, and when the potential consequence is 'serious physical injury.')  In determining whether the imminent danger provision applies, the court must evaluate whether the claimed danger was still in existence when a complaint was filed and whether such danger was sufficiently serious in light of the liberal standards accorded to pro se plaintiffs to require protection.  Chavis v. Chappius, 618 F.3d 162, 169-70 (2d Cir. 2010) (citations omitted).  Thus, vague, conclusory, non-specific or implausible allegations of imminent danger are insufficient to circumvent the three-strikes bar.  Id. at 170 (citations

---

imminent danger of serious physical injury.

Judge Sannes found that plaintiff had accrued three strikes under section 1915(g), but also made a preliminary finding that plaintiff faced imminent danger of serious physical injury, therefore allowing plaintiff to proceed IFP. Dkt. No. 10 at 6.

omitted).  Additionally, dismissal is not precluded by the fact that plaintiff has already been granted IFP status in this action.  Dkt No. 10.  When a court becomes aware of three prior strikes only after granting IFP status, it is appropriate to revoke that status and bar the complaint under § 1915(g). See McFadden v.. Parpan, 16 F. Supp. 2d 246, 247 (E.D.N.Y. 1998).

As noted in the undersigned's October 31, 2016 Report-Recommendation and Order, Judge Sannes previously reviewed plaintiff's litigation history and determined that plaintiff had accrued three strikes.  Dkt. No. 63 at 5 (citing Dkt. No. 10 at 3 n.4).  In the October 31, 2016 Report-Recommendation, the undersigned did not recommend revoking plaintiff's IFP status, as defendants failed to present the Court with evidence to disturb Judge Sannes' preliminary finding regarding the imminent danger exception, and, such a detailed inquiry by the magistrate judge into whether the allegations in plaintiff's complaint qualified for the imminent danger exception would have been in contravention of Second Circuit precedent.  See id. at 5-7.  This recommendation was without prejudice to renew. Id. at 7.  Judge Sannes adopted the Report-Recommendation in its entirety.  Dkt. No. 67. Thus, the undersigned now addresses whether plaintiff has sufficiently pled a condition which satisfies the imminent danger exception.

In initially granting plaintiff IFP, this Court relied on plaintiff's allegations of inadequate medical care concerning his diabetes to satisfy the imminent danger exception. See Dkt. No. 10 at 5-6; Dkt. No. 63 at 6 (citing Vandiver v. Vasbinder, 416 F. App'x 560, 562-63 (6th Cir. 2011) (summary order) (finding that the imminent danger exception was satisfied where the plaintiff suffered from diabetes and Hepatitis C and alleged that he was

denied healthcare); Day v. Bannish, No. 3:09-CV-254 (RNC), 2009 WL 2589556, at *2 (D. Conn. Aug. 21, 2009) (finding that the imminent danger exception was satisfied where the plaintiff alleged that a denial of medical care had worsened his diabetes and heart condition, and caused a chronic infection)).   The record currently before the Court demonstrates that defendants provided plaintiff with consistent medical care and treatment of his diabetes throughout his incarceration at Upstate. See subsection II.C. supra, 39-54 (detailing plaintiff's medical treatment); Pl. Med. Rec. at 5, 9-10, 26, 32, 37, 41, 45, 47, 49, 53, 55, 58, 60-61, 63-64, 66-68, 71, 73-74, 77-78, 81, 85, 87-90, 92, 94, 96-97, 101, 102, 104, 106-08 (detailing plaintiff's medical history from Dr. Schroyer, Dr. Mandalaywala, and P.A. Kowalchuk); see generally Dkt. Nos. 121-26, 121-31 (detailing plaintiff's consultation report records).   Moreover, plaintiff's medical records show that he routinely refused treatment while at Upstate.  See Pl. Med. Rec. at 5, 9, 16, 26, 32, 40, 42, 48-49, 66-67, 71, 73-74, 77-79, 81, 85, 88-92, 102, 104 (detailing plaintiff's medication and referral refusals); see also Dkt. No. 121-27 at 3-69 (compiling plaintiff's Refusal of Medical Examination and/or Treatment forms); Dkt. No. 121-26 at 30-31 (detailing plaintiff's cancelled consultations).  Moreover, as defendants note, on the day that plaintiff filed his initial complaint, he refused consent for a Controlled B diet with an evening snack, that he requested on September 27, 2014, as well as a urine test scheduled by his primary care provider to determine whether had protein or microalbumin in his urine.  See Dkt. No. Dkt. No. 121-7 at 181-82 (demonstrating plaintiff's refusal on October 6, 2014), 238 ("[inmate] demanding snack be provided by mess hall because his level may drop later on in evening."); Def. Mem. of Law at 23-24.  As there is no indication in the record that plaintiff

suffered from imminent danger at the time he filed his complaint, it is recommended that defendants' motion be granted and plaintiff's IFP status be revoked.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgement (Dkt. No. 121) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's claims against defendant C.J. Koenigsmann be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that plaintiff's amended complaint (Dkt. No. 16) be **DISMISSED** in its entirety, with prejudice, and it is further

**RECOMMENDED**, in the alternative, if the District Court Judge does not agree with the undersigned's recommendation on the merits, that defendants' motion pursuant to 28 U.S.C. § 1915(g) (Dkt. No. 121) be **GRANTED** and that:

(1) The order granting plaintiff's IFP status (Dkt. No. 10) be **VACATED**;

(2) The complaint be **DISMISSED** as to all claims unless plaintiff pays the filing fee of $400.00 within thirty (30) days of the entry of a final order by the district court; and

(3) Plaintiff be barred from filing any IFP complaints in this district unless he is under imminent danger of serious physical injury; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[21]

Dated: November 21, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[21] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).